## AMELIA CORINNE LANDAU v. PACIFIC MUTUAL LIFE INSURANCE COMPANY, Appellant.

In Banc, December 18, 1924.

1. **ACCIDENT INSURANCE:** Suicide: Accidental Means: Pleas: Ten-
der of Suicide Indemnity. Death resulting from accidental injury
is not a species of suicide, nor is suicide in any sense the result of
accidental injury; and an accident policy for the payment of thirty
thousand dollars in case the insured's death is the result of acci-
dental means, and of one thousand dollars in case of his death from
suicide, provides for the payment of indemnity upon the happen-
ing of either of two distinct casualties, unrelated, and contradictory,
for the existence of the one negatives the existence of the other;
and, therefore, where plaintiff sues for the larger amount alone,
basing her claim upon the charge of death from accidental means,
defendant raises the issue by a general denial, and its tender of
the suicide indemnity is gratuitous, except that it is an indirect
denial that death was caused by accidental means, and therefore
is illogical and unnecessary, tending to confuse the issue, for the
general issue still is whether the insured died as a result of bodily
injuries effected through accidental means, and the burden is on
plaintiff to establish that issue, and under this general issue de-
fendant can offer any evidence, including proof of suicide, that
tends to prove that plaintiff's cause of action never existed.

Landau v. Pac. Mutl. Life Insurance Co.

2. ———: **Fall from Street Car: Suicide or Accident.** The insured died from bodily injuries sustained as a result of his fall from a street car, and the whole question before the jury was whether his precipitation from the car was voluntary or involuntary, and that question resolves itself on appeal into the further question whether there was any evidence upon which to base their finding that it was involuntary or unintentional. *Held*, that every permissible inference that may be drawn from the evidence, tending to support the finding, must be indulged, but with that rule in view, and assuming further that there was no apparent motive for suicide, the record reveals not a single fact or circumstance from which the inference may be legitimately drawn that the insured's fall from the car was involuntary, but on the contrary many of them point irresistibly to the conclusion that the fall was his voluntary act.

3. ———: ———: ———: **Conjecture: Affirmative Evidence.** While it is true that many things, unknown to the witnesses or unobserved by the insured, may have happened as he was in the act of leaving the street car, which would have put an entirely different aspect on the observed occurrences, and while it may be true that he was thrown from the car by hidden forces whose operations were not discernible to the witnesses, an affirmative finding that he came to his death by accidental means must find support in the evidence in the case, and a verdict based on conjecture or speculation cannot stand.

4. ———: ———: **Presumption Against Suicide.** An inference of accident sufficient to take the case to the jury cannot be based on a presumption against suicide, where the occurrence resulting in the insured's injuries and death, together with all the attendant circumstances, are minutely described by eyewitnesses, and they definitely demonstrate that his every movement was voluntary. Such a presumption is indulged only when the cause and manner of the insured's death is wholly circumstantial. [Distinguishing Reynolds v. Casualty Co., 274 Mo. 83, and Brunswick v. Ins. Co., 278 Mo. 154.]

   *Held*, by JAMES T. BLAIR, J., that the fact that there was once a presumption in the case, operative for procedural purposes, which it is not proper to use as a basis of a direction to the jury, does not take out of the case the biological fact which is the basis of common knowledge.

5. ———: **Misrepresentations: Material.** Instructions relating to warranties in the insured's application for a policy which do not submit to the jury the materiality of the alleged misrepresentations should be refused.

6. ———: **Statement by Insured: Self-Serving.** A statement made by the deceased insured soon after he fell from the street car, if so

closely connected with the injury as to be competent as *res gestae* and if it tends to show accidental death, though self-serving, would in this case, in connection with other evidence, have been sufficient to take the case to the jury.

Citations Pertaining to Subject of Headnotes: (1) **Accident Insurance,** 1 C. J. pars. 278, 284, and **Suicide,** 37 Cyc. 519; (2) **Accident Insurance,** 1 C. J. par. 334, and **Appeal and Error,** 4 C. J. par. 2873; (3) **Evidence,** 23 C. J. par. 1795; 4 to 6, **Accident Insurance,** 4, 1 C. J. pars. 278, 336 (1926 Anno); 5, 1 C. J. par. 342; 6, 1 C. J. pars. 303, 337.

Appeal from Lincoln Circuit Court.—*Hon. Edgar B. Woolfolk,* Judge.

REVERSED AND REMANDED.

*Creech & Penn* and *Jones, Hocker, Sullivan & Angert* for appellant.

(1) The plaintiff failed to sustain the burden of proving that the death of the insured was accidental, and the trial court should have directed a verdict for the amount stipulated to be paid in case of suicide. (2) It is error to instruct the jury in an action upon a policy of accident insurance, that the burden of proof is upon the defendant to establish suicide. Brunswick v. Standard Accident Ins. Co., 278 Mo. 166; Laessig v. Insurance Co., 169 Mo. 280; Griffith v. Continental Casualty Co., 290 Mo. 455. (3) Presumptions are not evidence; and it is error to instruct the jury, in an action on a policy of accident insurance, that there is a presumption against suicide. Brunswick v. Standard Accident Insurance Co., 278 Mo. 173; Prentiss v. Illinois Life Insurance Co., 225 S. W. 695; Griffith v. Continental Casualty Co., 235 S. W. 83; 290 Mo. 455; Sacksberger v Grand Lodge, 73 Mo. App. 38. (4) The giving of an erroneous instruction on behalf of the plaintiff is not cured by the giving of a correct instruction on the subject for the defendant. Bellows v. Travelers Insurance Co., 203 S. W.

978; State ex rel. Long v. Ellison, 272 Mo. 571; Murdock v. Dunham, 206 S. W. 915. (5) The renewal of an accident policy is a new contract; and false representations made by the insured to secure the renewal of the policy in suit rendered the contract null and void. Long Bros. Grocery Co. v. U. S. Fid. & Guaranty Co., 130 Mo. App. 421; Commercial Bank v. American Bonding Co., 194 Mo. App. 224; Pacific Mutual Life Ins. Co. v. Vogel, 232 Fed. 337; Hodgson v. Preferred Acc. Ins. Co., 165 N. Y. Supp. 293.

*John L. Burns, D. E. Killam* and *Abbott, Fauntleroy, Cullen & Edwards* for respondent.

(1) The defendant seeks to sustain the contention that the deceased, with intent to end his life, willfully and intentionally projected himself from the side steps or running board of a moving car. The intent is the controlling feature of this defense, and the existence of said intent is sought to be proved by circumstances only. There is no direct evidence that any act done by insured was with intent to commit suicide. "Suicide" in law is the act of taking one's own life voluntarily and intentionally—self-murder. Sampson v. Lady Maccabees, 89 Neb. 641; Coverston v. Connecticut Mut. Life Ins. Co., 6 Fed. 654. Suicide is contrary to the general conduct of mankind and also shows gross moral turpitude in a sane person. Mallony v. Travelers' Ins. Co., 47 N. W. 52, 54. In insurance cases the presumption against suicide casts upon the insurer who claims that death was intentional the burden of establishing it by a preponderance of testimony. Travelers' Ins. Co. v. McConkey, 127 U. S. 661; Standard L. Ins. Co. v. Thorton, 100 Fed. 582, 40 C. C. A. 564; Sharland v. Washington L. Ins. Co., 101 Fed. 206; Supreme Ct. of Honor v. Barker, 96 Ill. App. 490; Sovereign Camp v. Truby, 70 Neb. 506; White v. Prudential Ins. Co., 120 N. Y. App. Div. 260, 105 N. Y. Supp. 87. (2) There is a presumption against death

305 Mo.—35.

by suicide, even where it is proved that death was self-inflicted. It is presumed to have been accidental unless the contrary is made to appear. Wigmore on Evidence, secs. 2510, 2540, note; Grand Lodge v. Banister, 80 Ark. 190; 18 Am. & Eng. Encyc. Law (2 Ed.) 77.

RAGLAND, J.—This suit has for its basis a policy of insurance issued by defendant to one Morris Rich. According to certain provisions of the policy, the defendant obligated itself to pay' to plaintiff, the beneficiary therein named, the sum of $30,000, in the event that the insured, while on a public conveyance, sustained bodily injury, through accidental means, which resulted directly, independently and exclusively of all other causes in death. The policy contained the further provision that in case of the death of the insured from suicide the defendant would pay the beneficiary the sum of $1000.

The petition, after alleging the execution of the policy and pleading the provisions thereof above referred to, except the stipulation as to suicide, to which no reference was made, stated:

"That the death of the said Morris Rich occurred on or about the 9th day of June, 1919, and resulted solely from bodily injuries effected directly and independently of all other causes through external, violent and accidental means, to-wit:

"The insured was engaged in riding upon a Creve Coeur Lake street car, returning from the lake to the city of St. Louis, at a point about one and one-half miles east of the lake, when and where he attempted to change his seat on the car and stepped into and on the side passageway of said car, and while being in and on the floor of said passageway of said car and in the act of going from one part of the car to another for that purpose, he accidentally fell from the car, which resulted in the following injuries, to-wit:

"Badly crushed leg and severe nervous shock and loss of blood which caused the death of the insured on said 9th day of June, A. D. 1919."

The answer admitted the execution of the policy and that the defendant thereby undertook and agreed to pay the plaintiff the sum mentioned in case of death of the insured from bodily injuries sustained while said policy was in force, from external, violent and accidental means, but denied all the other allegations of the petition. It further averred, however, that the death of the insured was due to suicide, and that said policy expressly provided that in such event the liability of the defendant should be limited to $1000. In addition to the above, the falsity of certain declarations made by the insured in his application for the policy and in his applications for the annual renewal thereof, alleged to have been warranties, was pleaded as a defense.

With respect to the facts the following from appellant's statement fairly outlines those about which there is no essential controversy:

"The insured, Morris Rich, was born January 14, 1850, and died June 9, 1919. In his earlier years he had been a mining engineer in the West; subsequently a contractor in St. Louis; and for perhaps ten or twelve years before his death he had done nothing. He had one child, the plaintiff here, married to one Landau, with whom Rich resided in St. Louis. He was quite fond of this daughter and her child. To his friends and social acquaintances he exhibited nothing wrong—nothing abnormal. . . .

"The Creve Coeur electric line runs a distance of about twelve miles in St. Louis County from Delmar Garden to Creve Coeur Lake. Delmar Garden is its point of connection with the city cars; Creve Coeur Lake, its other terminus, is a kind of summer resort. It runs (a double track) over a private right of way, mostly fenced, over hill and down dale, through cuts, over embankments and bridges. In physical characteristics it is in no respect unlike any ordinary steam railroad traversing a similar country, and is not at all like unto the ordinary city or large town electric car line. The longest trestle

on the line is one spanning both a creek and the tracks of the Rock Island Railroad, and situated about a mile and a half from the Creve Coeur Lake terminus. This trestle is three hundred feet or more in length and from twenty-five to thirty-five feet high. The western approach thereto is upon an embankment of three or four hundred feet in length, which, at its junction with the trestle, has a height of about twenty-five feet. The iron supports of the trestle project above the track level some three or four feet and are visible to passengers on a car approaching from the west six or seven hundred feet away, the track being straight and level for that distance. There are some sixty stopping places between Delmar Garden and Creve Coeur, seven of which are between the Rock Island trestle and Creve Coeur. Cars only stop at these places where there are either persons to get on or passengers to get off. At no point on the line will more than a minute elapse after a passenger on the car rings the bell before the car will reach and stop at the next stopping place, so frequent are they along the line. The running time from Delmar Garden to Creve Coeur was thirty-five minutes, with a five-minute stay at each terminus.

"Car No. 810 of the Creve Coeur Lake line is an open 'Moonlight' car. The seats run crosswise the car and are as long as the car is wide. The left or inner side of the car is inclosed with iron netting. There is a running board along the right-hand side of the car for passengers to step on in boarding the car, and handholds on the ends of the seats to assist the passenger in lifting himself from the running board to the floor level. Stanchions at every other seat support the roof and these also serve as handholds for the same purpose. Each seat is like every other seat. Each of them will seat six persons in entire comfort. The back of each seat is equipped with bells at convenient intervals, so that passengers may signal for stops. There are no accommodations of any kind on the car other than a place to sit down and ride. . . .

"At about twelve o'clock on the day of his death, June 9, 1919, Rich, the insured, boarded this car No. 810 at Delmar Garden and rode the thirty-five-minute, twelve-mile ride from Delmar Garden to Creve Coeur Lake. He sat in one of the rear seats. He did not get off the car during its five-minute stay at the lake, but rode back again to Delmar Garden. Arriving there, he again remained on the car during the stop, and rode back to Creve Coeur. Here he again did not get off. During all of this time he sat toward the rear of the car. He had not moved at all unless at one of these stops he had moved from one of these long seats to another next to it, as to which the operators of the car were uncertain. When the car was leaving Creve Coeur on Rich's second round trip, he occupied the third or fourth seat from the rear, alone. There were about twenty passengers on the car, and its capacity was sixty."

On his second return trip and while the car on which he was riding was entering upon the Rock Island trestle, heretofore described, Rich fell, or jumped, from the car, landing close to the railroad tracks some twenty-five or thirty feet below. He thereby sustained such injuries that he died within a few hours afterward.

Three eyewitnesses attempted to detail from the witness stand Rich's movements at and immediately prior to the time he left the car: Robert Hendricks, a high school boy sixteen years of age; a Mrs. Youngblood, the wife of the conductor in charge of the car; and a negro man named Blakesly. Just preceding the happenings testified to by these witnesses Rich was sitting on the end of the third seat from the rear—on the right-hand side of the car next to the running board; Mrs. Youngblood was on the seat immediately in front of him, sitting a little to his left, and with her face turned toward her husband who sat on her right and with whom she was engaged in conversation; Hendricks and a companion were sitting near the center of the seat immediately back of the one occupied by Rich; and Blakesly sat on the rear seat directly behind Rich.

Hendricks was offered as a witness by plaintiff; his version of what occurred is fully comprehended within the following excerpts from his testimony:

"Q. Now, this gentleman, Mr. Rich, who sat in the seat before you, I wish you would tell what you saw him do in the way of moving about, if anything? A. He got up and looked out along the car as if he was looking for the stop, and he sat down for about a minute, and he got out on the running board and down about the space of one handhold would be, and he left loose with his right hand and faced away from the car, and then the left one, and the next I saw of him he was going through the air.

"Q. What did he have hold of with his hands when he first got out on the running board? A. The handhold.

"Q. Which way was he facing towards the car? A. Towards the car when he first got out there.

"Q. What was he doing with both his hands when he first got out there? A. He first got up and went out, he was holding on the handhold with both hands.

"Q. Would you come down here and show me about how he was holding to those two uprights—suppose this is the upright, and suppose you are on the running board like he was? A. The car would be going in that direction, the seats run crossways, and the running board runs along here, and he got out here and held on with both hands on the handholds, and he turned around holding to this handhold like this, and it looked like he was ready to get off the car at the stop and the next time I saw him he was going through the air and his hands over his head and back to the car and about this far down (indicating to his waist). . . .

"Q. I understand you, he raised up out of his seat and held by this support and leaned out of the car and looked down the track as though he was looking for something? A. Yes, sir; along the track like a man would look for a stop.

"Q. Whether he was looking for a stop or the trestle, you don't know, of course, but he was leaning out and looking down the track, didn't he? A. Yes, sir.

"Q. He was looking at the ground, not the floor of the car, wasn't he? A. He was looking along the outside. . . .

"Q. Then he sat down? A. Yes, sir.

"Q. He sat there a minute, or a short interval? A. Yes, sir, a short time.

"Q. And then he got up and he had hold of the support with his right hand and support with his left and backed off on this running board, didn't he—is that right? A. Yes, sir.

"Q. Stepped down? A. Yes, sir.

"Q. With his face turned in? A. Yes, sir.

"Q. And his back turned out? A. Yes, sir.

"Q. Well, now, at that time you hadn't gotten to the trestle quite, had you? A. No, sir.

"Q. You were then running along the ground? A. Yes, sir.

"Q. Well, now, he turned loose with his right hand? A. Yes, sir.

"Q. And turned around with his back to this car? A. Yes, sir. . . .

"Q. And where was his face, where was his head, which way was his face turned? A. Away from the car. . . .

"Q. And then he left loose with that hand—what did he do with his body, Robert? A. Next I saw him—

"Q. Did he swing his body? A. No, sir, I couldn't say that he swung his body.

"Q. The next you saw his hands were up and his feet down, and he was going out from the car? A. He was in an upright position with his hands about his head and his back to the car, and he was going down. . . .

"Q. I want you to show how he got down from his seat, how he went off the step, how he first got down on the step, what he did; just go ahead and do it? A. He

took hold of this handhold and stepped out and grabbed the handhold next to it, and he would be standing in this position looking at the car; he left go with his right hand like this, and stepped around, turned his body, still holding this handhold, and the next time I saw him in this position with his back to the car going through the air, he had just dropped a few feet then.

"Q. So you didn't see him actually in the act of leaving the car; the last you saw him he had hold with his right hand, turned around with his back to the car? A. Yes, sir.

"Q. You said a moment ago, I believe, he was standing there like a man who was coming to a stop? A. Waiting for the car to stop, ready to get off the car. . . .

"Q. That's the way he looked? A. Yes, sir. . . .

"Q. Robert, you told the jury the other day about this man going down with his hands up and his back towards the car and his feet down; was he alongside of the car or out from it? A. He was away from the car a pretty good distance. . . .

"THE WITNESS: He was standing holding with both hands like that, and he left aloose with his right hand and still holding with his left hand, like we go to get off the car, and he didn't swing down hard, just let loose ordinary like, like he was getting ready to get off the car. . . .

"Q. Did you see him at any time grab for anything as though he was falling? A. No, sir.

"Q. Did he make any outcry? A. No, sir.

"Q. Did he say anything? A. No, sir . . .

"Q. Now these movements, the old man getting off and his hand being loose from the car and turning around, . . . did that occur quickly or not? A. Just a minute or a few minutes."

Mrs. Youngblood and Blakesly were called as witnesses by defendant. The former's description of Rich's movements and of the manner of his exit from the car corresponded in all essential details with that given by

Hendricks, except that she stated that the motion of Rich's body as it left the running board indicated a swing or jump.

Blakesly testified:

"When we got near McKelvey road I thought maybe he was going to get off the car; when we got to McKelvey road he got up and looked down the track, and he sat down and pulled his hat down over his head and pulled it off, and wiped his face and looked awfully funny in the face, and his eyes rolled; and when he got near the trestle he leaned out and looked out again, and when he got right on the trestle he run out on the step and made a jump."

Immediately following the occurrences just narrated, the car was stopped and the motorman, Burnett, a passenger named DeArmas and the negro Blakesly went down the railroad embankment to the bottom of the trestle where Rich lay. As they approached the latter one of them said, "The man is dead." Rich said, "No, I am not dead." He told them his name and address; he also gave them the name of his son-in-law, Landau, and that of Dr. Sandperl, and asked that they be called. No particular examination was made as to his injuries, but it was observed that the bone of one leg had gone through his shoe, tearing the sole loose from the upper. He was carried to the car and laid on the back seat and DeArmas sat by him as the car proceeded on its run. He asked DeArmas whether he thought that he, Rich, would get well, and was reassuringly told that he would. He then said that he was suffering such pain that he wished he could die. DeArmas testified further:

"Q. What other conversation did you have with him in the car? A. I set him up, I put my hand around his head, holding his head on my hand; I said, 'Old man, did you really jump off or fall off?' He did not answer me. I thought he could not talk or was unconscious. I said, 'Did you jump off?' and he looked at me, and then I said, 'Did you fall off?' He did not answer. Right after that he gave me the envelope.

"Q. What did he do? A. To have his name right, to keep it.

"Q. Was his voice strong then? A. Pretty strong then."

The envelope referred to by the witness had on it Rich's name and address. Prior to Rich's fall from the car it was running at the rate of from fifteen to twenty miles an hour until it approached the trestle, when its speed was somewhat diminished. It had some rocking motion, but there is no indication from the evidence that there was a jerk or lurch at any time. The facts summarized in this paragraph were taken from the testimony of DeArmas and Burnett, witnesses called by plaintiff.

The evidence as to the presence or absence of a motive for suicide took a wide range. That on the part of defendant tended to show that Rich in early life had been infected with syphilis; that owing to what he deemed inadequate treatment for it he was in constant fear that locomotor ataxia would develop, rendering him a helpless paralytic and disgracing him in the eyes of his family and friends by its disclosure of an incident of his private life; that he read all the literature on the subject that was obtainable and was treated by eminent specialists both in this country and in Europe; that he repeatedly stated that he would commit suicide if locomotor ataxia developed; and that marked symptoms of the disease, plainly discernable to the trained eye of the physician but not noticeable to the layman, had made their appearance a short time before his death.

In rebuttal plaintiff called a large number of personal friends and associates of the deceased whose testimony tended to show, in the language of her counsel, that "he (Rich) was in good health, free from all financial difficulties, happy in his home life, devoted to his daughter and grandchild, a believer in God and a future state of rewards and punishment. That he was happy, buoyant, . . . loving life and his friends, and pos-. sessed (apparently) in full . . . measure all those

things that make one cling to life and regret that the day of death is approaching.''

The trial court refused a request by defendant for a peremptory instruction in the nature of a demurrer to the evidence, at the close of plaintiff's case in chief, and again when all the evidence was in. For plaintiff the court gave among others the following instructions:

''6.   The court instructs the jury that as to the defense that the deceased committed suicide, the presumption of the law is Rich did not commit suicide, which presumption of law must be overcome by the weight of the evidence in the case, and if you believe such defense is not established by the weight of all the evidence in the case, you should not find against plaintiff on that issue.

''7.   The court instructs the jury that, although the jury may find and believe from the evidence in the case, that Morris Rich did not commit suicide, yet the burden of proof that the death of Morris Rich was from accidental cause rests upon the plaintiff, and that unless such burden of proof is met by the proof of death of said Rich by accidental cause by the greater weight of all the evidence in the case, your verdict will be for the plaintiff for the sum of fifteen hundred dollars only, and interest as provided in other instructions.''

It also instructed the jury at the instance of defendant that it devolved upon plaintiff to prove by the greater weight of the evidence in the case that the insured accidentally fell from the car. The defendant also asked a series of instructions covering its pleaded defense of breach of warranties, which were refused. The jury returned a verdict for plaintiff in the sum of $32,010. From the judgment rendered in accordance therewith defendant prosecutes this appeal.

Appellant assigns as error: (1) the refusal of the trial court to direct a verdict in its behalf; (2) the giving of plaintiff's instructions six and seven; and (3) the refusal of its instruction with reference to the alleged false

statements made by the insured in his applications for the policy and the annual renewals thereof.

I.   The policy of insurance that is the basis of this action provides for the payment of indemnity upon the happening of either of two distinct and unrelated casualties—death from accidental injury and death from suicide. These two casualties are generically unrelated, because death resulting from accidental injury is not a species of suicide, nor is suicide in any sense the result of accidental injury. Not only are they unrelated, but the existence of one negatives the existence of the other. To say that death was caused by accidental means is to assert that it is not the result of suicide, and *vice versa.* In this case the plaintiff alleged that the death of the insured was the result of accidental injury and predicated her cause of action thereon. The tender by defendant of judgment for the indemnity provided by the policy for suicide was gratuitous. It was no defense to the cause of action pleaded, except that it was an indirect denial that death was caused by accidental means. The setting up of suicide in the answer was illogical and unnecessary, tending to confuse the issue. The defendant could have offered proof that the death was the result of suicide or resulted from disease or natural causes, under a general denial. Under the general issue the defendant can offer any evidence that tends to prove that plaintiff's alleged cause of action never existed. The rule is elementary. Recurring to the petition it alleged as the predicate of defendant's liability that the death of the insured resulted from bodily injury effected through accidental means. This was denied in the answer in direct terms, and also indirectly by the averment that the death resulted from suicide. The issue under the pleadings therefore was whether the insured died as a result of bodily injuries effected through accidental means. It was affirmed by the plaintiff and denied by the defendant.

*Pleading: Unrelated Casualties.*

Consequently the plaintiff had the burden of proof. [Griffith v. Continental Casualty Co., 290 Mo. 455; Griffith v. Continental Casualty Co. (second appeal), 299 Mo. 426.]

II. Appellant's principal contention is, that it was entitled to a directed verdict in the court below, because of the entire absence of any evidence tending to show that the insured died as the result of bodily injury effected through accidental means. There is no question of insanity in the case, and no suggestion of death from natural causes. Plainly the insured died from bodily injuries sustained as a result of his fall from the car. Was his precipitation from the car voluntary or involuntary? that was the sole question before the jury. Whether there was any evidence upon which to base their finding that it was involuntary is the question presented here.

The only way in which a tribunal can determine the intention with which a given act was done by one who was at the time a free moral agent, at least in the absence of a declaration by the actor, is through the inferences that may be drawn from his acts and conduct accompanying the principal act, in connection with the circumstances surrounding him at the time it was done. In a very true sense, therefore, the finding as to such intention must be based on circumstantial evidence. Notwithstanding, where all the facts and circumstances from which the inferences as to intention may be drawn are in proof, and they are of such character as to evidence a specific intention, the finding with respect thereto must be predicated on them, and not on legal presumptions which obtain only in the absence of evidence. Such is the case at bar.

In reviewing the evidence for the purpose of determining whether it affords any basis for the jury's finding that the insured's fall was unintentional, every permissible inference that may be drawn therefrom, tending to support the finding, must be indulged. In this connection it should be said that defendant's evidence, viewed

from every possible angle, does not, whether considered by itself or in connection with that offered by plaintiff, give rise to any such inference, even the slightest. It may therefore be eliminated from consideration.

The facts disclosed by the evidence have been fully set forth in the preceding statement and need not be repeated. Those that are wholly unambiguous and speak with but one voice as to Rich's intention relate to his acts and movements immediately preceding and accompanying his fall from the car. All that he did up to that time is entirely consistent with either view, that is, that his fall was involuntary, or that it was intentional. We come therefore at once to an examination of the facts and circumstances immediately attending that occurrence.

Rich was a man sixty-nine years old; he was short and rather stout, weighing about two hundred pounds; he was familiar with the railroad over which he was riding, its cars and equipment and its physical features and characteristics. Shortly before the Rock Island trestle was reached he stood up and looked, with his head outside of the car, "along the track like a man would look for a stop;" he then sat down; after a short interval he again stood up, took hold of the handhold on the end of the seat upon which he had been sitting, with his left hand, and the hold on the seat in front of him with his right hand, and stepped down on to the running board with his face turned in toward the car, and his back turned out; he then "left loose with his right hand and faced away from the car, and then with his left one;" the next instant he was going down in an upright position with his hands about his head and his back turned toward the car. There was no intimation by the witness, Hendricks, that Rich's holds on the handholds were released by any jerk, jar or other movement of the car, nor can any inference of that kind be drawn from his description of the occurrences. On the contrary, he said that Rich "let loose ordinary like, like he was getting

ready to get off the car." The witness did not see Rich at the very instant that the latter left the running board and could not say that he swung his body in leaving it. Immediately thereafter, however, when he did see him (at that instant Rich was visible to the witness from his waist up), he was going down "away from the car a pretty good distance." When he was picked up near the Rock Island Railroad tracks twenty-five or thirty feet below there were no visible injuries to any part of his body except his feet and legs, which were broken and mangled, the bone of one leg had gone through his shoe severing the sole from the upper, circumstances plainly indicating that during the fall he had held his lower limbs rigid—that he had gone down "stiff-legged."

What was Rich's purpose in getting out on the running board? It cannot be supposed that one of his mature years was merely seeking the novel experience of riding on the running board of an electric car, running at the rate of from fifteen to twenty miles an hour. If he were attempting to change his seat simply, it is extremely improbable that he would have relinquished his holds on the handholds or supports, or that he would have turned and faced away from the car. But whatever may have been his purpose in getting out onto the running board there is not a fact or circumstance in evidence which gives rise to the inference that any motion or movement of his was involuntary. There was no unusual movement of the car, no sudden jerk or roll, and no curve of the track to give rise to the operation of centrifugal force. On his part there was no movement of arms or body indicating an effort to restore lost equilibrium, no outcry or appeal for help. He "just let loose ordinary like, like he was getting ready to get off the car" and "went down in a upright position," "stiff-legged," and with his hands up about his head, "away from the car a pretty good distance."

Nothing that was said or done by Rich after his fall affords any evidence that the fall was accidental. His

refusal to answer DeArmas's question whether he really fell off or jumped off, gives rise to a contrary inference.

In cases where the question is presented of whether death resulted from accident or suicide, courts as well as juries are reluctant to reach the conclusion of suicide. Sometimes they shut their eyes to the facts and resort to presumptions to avoid such an untoward result. In this case, however, not only are all the facts in evidence, but those facts are of such character as to afford a sufficient evidentiary basis for a finding as to the insured's intention with respect to the acts which culminated in his injury and death. For that reason the aid and comfort so frequently sought from the presumption against suicide must be foregone. Notwithstanding that the presumption may not be invoked, in passing upon the evidence it should be kept in mind that the instinct of self-preservation is deeply implanted in all living things and that such instinct is an over active principle of life; nor on the other hand should it be forgotten that men do frequently voluntarily destroy themselves. With all these things in mind, and assuming further that there was no apparent motive for suicide, we have searched the record in vain for a single fact or circumstance from which the inference may be legitimately drawn that the insured's fall from the car was involuntary—unintentional. On the contrary many of them point all but irresistibly to the conclusion that the fall was his voluntary act. It has been suggested that many things might have happened, unknown to the witness or unobserved by him, which would have put an entirely different aspect upon the occurrences which he did see. Or that the insured may have been thrown from the car by hidden forces whose operations were not discernible to the witness. All of which may be true. But an affirmative finding that the insured came to his death by accidental means must find support, if at all, in the evidence in the case and not in speculation or conjecture.

This case differs from Reynolds v. Casualty Co., 274 Mo. 83, and Brunswick v. Ins. Co., 278 Mo. 154, cases cited and strongly pressed by counsel for respondent as supporting their contentions. In each of these cases the evidence relied upon to show the cause and manner of the insured's death was wholly circumstantial. It was specifically ruled in the Brunswick case, 278 Mo. 154, l. c. 176, following the Reynolds case, that as the facts proved and which tended to show suicide were not sufficient to exclude every reasonable hypothesis showing accident, there was left, on account of the presumption against suicide, an inference of accident sufficient to take the case to the jury. The basis of that ruling was the fact that the evidence was entirely circumstantial. In the case at bar the occurrence that resulted in the insured's injuries and death, together with all the attending circumstances, was first minutely described by an eyewitness called by the plaintiff, and then by two called by defendant. The facts and circumstances so detailed by them cannot be said to be so equivocal in character as to preclude a finding on them unaided by presumption, as was the case in Griffith v. Casualty Co., 290 Mo. 455. On the contrary they signify very definitely that the action of the insured in his every movement until he finally committed himself to the unrestrained force of gravitation was wholly voluntary. With such evidence in the record the legal presumption against suicide had no place in the case for any purpose whatever. [Mockowik v. Railroad, 196 Mo. 550, 571.]

As the evidence wholly failed to show that the insured's death was effected through accidental means, the trial court should have directed a verdict for defendant.

From what has been said as to the issues and the burden of proof it is manifest that Instructions 6 and 7 given for plaintiff were erroneous. [Griffith v. Casualty Co., supra.]

Defendant's instructions relating to breach of warranties did not submit to the jury the question of the

305 Mo.—36.

materiality of the alleged misrepresentations. It was not error to refuse them. [Lamport v. Assurance Corp., 197 S. W. 95.]

Burnham, the motorman, was the first person to reach Rich after the latter's fall from the car. While Burnham was testifying as a witness for plaintiff, he was asked by her counsel what statement, if any, Rich made on his first getting to him as to how he (Rich) happened to be there. Defendant's counsel objected on the ground that the question called for a self-serving statement on the part of the insured. The objection was sustained. If the statement sought to be proved tended to show an accidental fall, and if it was competent as a part of the *res gestae* (as to which we express no opinion), it, in connection with the other evidence in the case, would have been sufficient to take the case to the jury.

For the errors pointed out the judgment is reversed, and the cause remanded. *Graves, C. J., Woodson, White* and *David E. Blair, JJ.,* concur; *James T. Blair, J.,* concurs in the result, only, in separate opinion.

JAMES T. BLAIR, J. (concurring).—The opinion in Division in discussing the facts seems to me to go off, on that question, on a weighing of the evidence. The fact that there was once a presumption in the case, operative for procedural purposes, which it was not proper to use as the basis of a direction to the jury, did not take out of the case the "biological fact" which "is a part of common knowledge" (Griffith v. Continental Casualty Co., 299 Mo. 426,) and which, with the other evidence, ought to be weighed by the jury and not by this court. The opinion concedes this in principle and denies it in fact. The dissent was designed to bring this question into Banc. There was error in instructing the jury, and for that reason I concur in reversing the judgment and remanding the cause.