J. E. PERRINGER, EXECUTOR OF THE ESTATE OF CHARLES L. BUFORD, DECEASED, ORIGINAL PLAINTIFF, MARIE C. BUFORD, SUBSTITUTE PLAINTIFF, RESPONDENT, v. METROPOLITAN LIFE INSURANCE COMPANY, A, CORPORATION, DEFENDANT, APPELLANT.—244 SW (2) 607.

Springfield Court of Appeals.   December 20, 1951.

*Oliver & Oliver, R. B. Oliver, Jr., Gerald B. Rowan* for Appellant.

*Melvin Englehart, Dearing & Matthes* for Respondent.

524

VANDEVENTER, P. J.—Suit on an accident insurance policy for death. Verdict and judgment in the sum of $5,000.00, and defendant appeals.

The petition alleged the issuance of the policy to one Charles L. Buford, (whose nickname was Tots) payment of premiums, the death of the insured by purely violent and accidental means, denied that death was caused by suicide, alleged that defendant had failed and refused to pay, with a prayer for judgment.

The answer admitted the issuance of the policy, the payment of premiums, the death of the insured and that the policy excluded liability if the insured committed suicide while either sane or insane and alleged that the insured did commit suicide and the death was not accidental. As a further defense the answer stated that the death of the insured occurred as a natural and probable result of his intentional, wrong and felonious acts in entering the dwelling place of one Margaret Burns during the night time, and in her absence for the purpose of lying in wait for her, armed with a pistol, with the intention of murdering her, or with the intention of frightening and threatening her by exhibiting and brandishing the pistol in her presence, or with the purpose and intention of killing himself. That in pursuance of one or the other of these objects, when Miss Burns entered her home, in-

sured raised the pistol which he had brought with him and aimed it at her with the intention of killing her or frightening or threatening her and that Miss Burns in defending herself engaged in a scuffle with deceased, tried to gain possession of the revolver or deflect the aim thereof, and during the scuffle, it was discharged and insured was killed.

The first question is the sufficiency of the evidence and whether the trial court should have sustained defendant's motion for a directed verdict at the close of all the evidence. The answer to this question, therefore requires an examination of the testimony in detail.

The first witness for plaintiff was the Coroner, Sam Najim, Jr. He testified that he was called to the residence of Margaret Burns about 2 a. m., on October 13, 1949. That Sheriff Winfred McDaniels, Trooper Lloyd Murphy, Prosecuting Attorney Henri Sursa, and probably Reverend Guest, who lived two doors away, were present. That this residence faced west and was located on the east side of South Main Street in Fredericktown, Missouri; that it was 40 or 50 feet from the sidewalk; that there was no street light immediately in front of the house, but there was one 140 or 150 feet to the north; that on each side of the front entrance to the residence was a tall slender evergreen and nearby, some low evergreens, but that none of them were in front of, or obstructed, the front door, which had a small opaque glass pane about three to five feet up from the bottom and approximately ten inches square. This door entered into a living room approximately ten by sixteen feet in size and directly, as you entered the door, to the left and north of the living room, connected by an open archway six and one-half feet wide, was the dining room, which was very small—about seven by eight feet. The front door had a bullet hole in it, about three feet from the floor, ranging down and it had, after passing through the door into the dining room hit a chair or table and entered the wall of the room near the baseboard. Lying in the dining room on his back, in front of a buffet, about two feet from the east wall of the dining room, with his feet extending slightly through the arch between the rooms and into the living room, was the deceased, Charles L. Buford. About eight or ten inches from his right arm was a dark colored revolver. His hat was lying on the floor and he had a bullet wound in his head. The bullet had ranged upward, had apparently entered slightly above the right temple, gone through his head and come out on the left side and toward the back and upper portion of his skull, and had gone on into the ceiling. Where the bullet entered the ceiling were small spots of human blood or flesh, indicating that it had already gone through the head of the deceased. There was no evidence of other bullets. It was the opinion of witness that deceased could not have fired the revolver after the bullet pierced his head. The witness further testified that there were several windows in the house that were equipped with

venetian blinds. His impression was that the blinds were closed but he was not positive.

. He was not only coroner but also undertaker and prepared the body for burial. He testified that he thought, but was not positive, there were powder burns around the wound in the head but it was so covered with coagulated blood that it was difficult to be sure. He testified, however, that on the left hand of the deceased, in the palm near his thumb and forefinger were powder burns. That these burns on the left hand could have been caused by grasping the revolver around the cylinder while it was being fired. The deceased was right-handed. The revolver was a 38 Colt, serial number 307585. In his opinion, the wound immediately caused death, that the bullet hole in the door must have been put there before the bullet went through the head of deceased, because in his opinion, the latter produced instant death. He further testified that the night before the trial, which was some 15 months after the insured met his death, he had gone to the Burns residence at 6:30 in the evening, had gone in the house and with the lights turned off, and could not see the same revolver held in his hand. But he further testified on cross-examination:

"Q. Was the door open or closed?

"A. Open.

"Q. Where were you standing?

"A. I wasn't to the right of the door; I don't mean away from the door. I was closer to the right side of the door than the left side and was about four and a half feet inside the door.

"Q. Which direction were you facing?

"A. Toward the outside.

"Q. This was at six-thirty last evening?

"A. Yes, sir.

"Q. You say the front door was open?

"A. We opened the front door, yes.

"Q. Was the front door open at the time you were in there with this gun and said you couldn't see it in your hand?

"A. I would like to change my statement a little. When we first checked it the door was closed, but it later was open. It was tried closed and later open.

"Q. Could you see it in your hand with the door closed?

"A. No, sir.

"Q. How far did you hold it from your face?

"A. I held it within a foot and a half or two feet.

"Q. It was pitch dark in there?

"A. Yes, sir.

"Q. Was the moon shining?

"A. Not that I recall.

"Q. Was it cloudy yesterday evening?

"A. I would say so, fairly."

He identified photographs (Defendant's Exhibits 2 and 3) as fairly representing the body of deceased as he found it. These photographs show the revolver lying near the right hand of the deceased.

Three other witnesses were introduced by plaintiff to show that the deceased was a church member, a public spirited citizen, an active member of the Chamber of Commerce, interested in the present welfare and future of Fredericktown, engaged in stock-raising, business and farming. That he was in excellent financial circumstances, apparently happy and contented, planning for the future, had every indication of sanity and appeared to be in full possession of his mental faculties. That he had not, to their knowledge displayed any suicidal tendencies, did not appear to be worried or have any troubles of a serious nature. One of them knew he was interested in Margaret Burns and was getting a divorce from his wife. Another, an attorney representing deceased's wife in the divorce suit, testified that the property rights between deceased and his wife had been agreed upon and the divorce suit would not have been contested. That in the property settlement, deceased's wife was to receive $45,000.00 in cash, a new automobile, their residence and a small tract of land, "That property settlement had been executed subject to that decree of divorce."

The pistol and the insurance policy were introduced in evidence and plaintiff rested.

At the close of plaintiff's evidence, defendant filed a motion for directed verdict alleging plaintiff's evidence was insufficient as a matter of law to authorize a verdict for plaintiff. This motion was by the court overruled.

L. L. Murphy, a highway patrolman who lived in Fredericktown, testified for defendant. He was in Fredericktown on the night of the tragedy and went to the Burns' residence. He received the call to go at 2:05 a. m., October 13, and arrived at the Burns' home at 2:10 a. m. He testified that the front door of the residence swings from the right, back to the left into the living room, toward the dining room and toward the north. He observed some bullet holes. One was in the northwest corner of the living room ceiling, approximately 28 inches from the west wall of the house and approximately 14 inches from the archway between the living room and the dining room. It was located back from and above the door. There was another bullet hole in the front door. It had entered from the side that would have been the outside of the door if it had been closed, approximately 38 inches from the floor, and ranged slightly downward. It went through the door, struck the back of a dining room chair sitting behind the door and on into the dining room wall, approximately 8 inches above the floor. It could not have entered the door in that manner and followed its course unless the door was open. The witness examined the revolver found on the scene and it was a 38 caliber Colt. It contained four live cartridges and two fired cartridges, one of them under the hammer and the other

in the chamber just to the right thereof. The witness was familiar with this type of revolver and testified that its cylinder revolved to the right. He examined the body of the deceased and discovered powder burns on the index finger of the right hand, and on the palm of the left hand were additional powder burns that extended toward the tips of and in between the fingers. He stated that if a man held a revolver to his head with his right hand and put his left hand over the cylinder, in his opinion, he would receive such powder burns. It was also his opinion that the powder burns were caused from the gun. From his experience with firearms, he testified, that powder burns would be caused upon the discharge of a revolver, by the burning powder escaping from both the back and front of the cylinder, the amount depending upon the type of gun and whether the gun was in good condition. "A loose gun will throw a lot more powder than a new gun." This gun was in reasonably good condition but was definitely not tight.

It was approximately four feet from the edge of the door to the deceased's body. The revolver was not examined for finger prints. When he saw the revolver, it was approximately six inches from the body of the deceased. The bullet that went through the door was fired at a down angle and the one that went into the ceiling at an upward angle. The one in the ceiling was about 14 inches from the partition between the living room and dining room. The body was all in the dining room except about six inches, which was in the living room. His head was away from the archway. Around the bullet hole in the ceiling were specks of blood. There were three windows in the front of the house, one in the living room, one in the dining room and one in the kitchen, which adjoined the dining room immediately to the north. These windows had venetian blinds which were closed so he could not see in from the outside. He did not recall the condition of the shade on the window of the south side of the living room. He could see in with the front door open.

Joe Jeffery testified for defendant. He was night marshal of Fredericktown on the night of October 12 and morning of October 13th and on duty. He was on Main Street in Fredericktown when a man named Halligoss, drove up in a car, opened a car door and told him to get in and they went to the Burns' home about 2 o'clock in the morning. It was only three blocks to the house. No one was there but Margaret Burns and her mother. When he arrived, he met Miss Burns between the street and the house. The lights were on in the house. The first persons to arrive thereafter were Doctors Slaughter and Grossman, then Patrolman Murphy and Prosecutor Sursa. Witness stayed there only ten minutes and went back to town.

Henri Sursa, another witness for defendant, was Prosecuting Attorney at the time of the tragedy and on the early morning of October 13th went to the home of Margaret Burns. Trooper Murphy was there when he arrived. He observed the body of deceased, examined his

hands and on the right hand "observed little or nothing, but on the left hand in the palm was signs of burns." He did not know whether they were powder burns as he was unfamiliar with revolvers. He made an investigation of the death of Mr. Buford and stayed there perhaps two and one-half hours.

Bill Griffin, who lives in Fredericktown and was an employee of deceased, working at his garage and at his farm, identified the pistol found at the scene of the tragedy as belonging to Buford. Buford usually kept it under the head of his bed. He had cleaned the pistol for Buford on Sunday before the tragedy, which was on the following Wednesday, and he had also seen the pistol at 4 o'clock in the afternoon before the tragedy which occurred early the next morning. At that time it was lying at the head of Buford's bed at his home. Later that same afternoon at the garage, he heard Buford and Margaret Burns talking something about getting married, but could not remember exactly what was said. "I heard him say something but someone come up outside and I had to leave." He didn't pay much attention but his recollection was: "I believe she said Tots was too old or something like that. I believe that is the way it was."

On cross-examination, witness admitted testifying at the inquest and also admitted that in his answer to the question relative to this conversation, "Did you hear anything they were saying," that he answered, "They were standing, talking, but I didn't hear what they said, a car came up and I went outside."

Everett Boyd, for defendant, testified that his home was in Fredericktown and he was a taxi driver, engaged in that business in the year 1949. He knew Buford, the deceased, well and hauled him in his cab many times during the year prior to the tragedy. On these occasions, Buford would have him drive from place to place trying to find Margaret Burns. They would find her occasionally, drinking beer or cokes and dancing in the company of a man, whom witness did not know. This happened six or eight times during six months immediately preceding the tragedy. On three other occasions, the deceased had hired him to watch the home of Miss Burns to see with whom she left and with whom she returned. He was also instructed to follow her and see where she went. At one time he followed her to Greenville and she met a man in a Lincoln automobile. He was a pipe line worker she was keeping company with and his name was Al Halligoss. On the morning Buford was killed, he took Dr. Slaughter to the Burns' residence and saw this man, "Al, Mr. Jeffery, Mrs. Burns and Margaret and a couple from next door. I don't know their names."

W. A. Gordon, a taxi driver, living at Fredericktown and testifying for defendant, said that for six months prior to the tragedy he had on various occasions driven deceased around town and occasionally would take him out on the highway. On the night of October 11th, the deceased hired him to go to the house of Margaret Burns and watch

it. He parked near and stayed there from 10 o'clock at night until 1 o'clock in the morning. He saw Miss Burns come in about 1 o'clock in an automobile with someone, whom he thought was a man and he immediately by telephone reported this fact to Mr. Buford. The deceased had instructed him to do the watching and paid him for doing it. On the evening of October 12th, he saw deceased on the square in Fredericktown and was instructed by him to follow him over to his home. Deceased was in his own car. The witness followed him, he got in the cab and they went out on Highway 67 to the intersection of 61 and then north on 61 about ten miles from Fredericktown to the Rainbow Tavern. They parked within 20 or 30 feet of the tavern and could see through the window enough to recognize people inside. Deceased said something about wanting a beer and witness went in and bought a bottle of beer and brought it out to the car. They could see Margaret Burns in the tavern through the window with two other persons, seated at a table, drinking. Witness did not know the people at the table with her. She was also dancing occasionally. They stayed there from 9 o'clock until about 12 when the outside lights were turned off and during this time deceased went in three or four times and bought a bottle of beer, bringing it out to the cab and drinking it. The witness never saw deceased speak to Margaret Burns any time he went into the tavern, but when he saw her dancing with someone, he told the cab driver. " * * that was a heck of a way for a friend to treat a friend * * " or something like that. They then came back to Fredericktown and stopped near Margaret Burns' house. Deceased got out of the cab, went up to her house, presently came back and said, "That house was unlocked." He sat in the car for a short time and again went toward the house, was gone just a few minutes but said nothing upon his return except he told the witness, the cab driver, referring to Miss Burns, that "he had to see her that night, or he needed to see her that night, or something like that."

The cab driver then took Burford to his home, where he let him out and saw him no more that night. It was about one-half or three-fourths mile from deceased's home to that of Margaret Burns.

On cross-examination, the witness said that deceased made no threats against Miss Burns, that he talked intelligently and paid the cab driver for his services. He did not observe deceased having a gun with him.

The deposition of Margaret Burns McCoskey was introduced in evidence on behalf of denfendant. Her testimony showed that she was, at the time of testifying, living in Albuquerque, New Mexico and was then employed as a court reporter for the district court. She had married Mr. McCoskey in New Mexico, February 24, 1950.

In October, 1949, she was working in Fredericktown, Missouri for the Buford Chevrolet Agency and was living with her mother. She had worked the afternoon of October 12th at the Buford Chevrolet

office, owned by the deceased, Charles L. Buford. She had gone home to dinner and Mr. Buford called her and said he had to see her, so she went down to the Chevrolet office. He told her he was getting his divorce the next day and wanted her to go out with him the next evening, which would have been the evening of the 13th. He asked her what she was going to do that night, (the 12th) and she told him she had an engagement for that night. She further testified, "He wanted, he said he was getting his divorce the next day and wanted me to marry him and I told him I wasn't interested in marrying him at that time, that I wanted to go back to doing reporting again, and he asked what I was going to do. I told him I had an engagement, I was going out that night."

Buford had a nickname, "Tots", by which he was generally known in the community of Fredericktown. He signed his name a great deal of the time that way, and everyone that knew him called him by that name. At the time of Buford's death, she was alone with him in her living room at her mother's residence. Her mother was in the home at the time but apparently had retired and was asleep. Miss Burns returned from her dinner engagement with her gentleman friend between 1 and 2 o'clock. She got out of the car, went up to her house and opened the door. She had seen Buford's car parked across the street from her house and she thought he was in the car. She ran up the sidewalk and opened the door because she did not wish to have any discussion with him. When she opened the door and took a step or two into her living room, with the door still open, deceased, who was in the dark living room, threw his arms around her and said: "It has to be him or me."

"Q. And what did he—what action did he take?

"A. Well, I just answered and said, 'Oh, Tots, don't be silly', and with that he said something else to me about having a good time—looked like I was having a good time, and I answered him and said I was having a good time, and there wasn't much more. I don't believe there was another word uttered and he had a gun in the side of my head.

"Q. Was he holding the gun?

"A. He certainly was."

She discovered he was holding a pistol in his right hand against the side of her head. She raised her left arm "to try to get the gun out of my head." She hit the gun and it discharged. She screamed and the deceased pointed the gun at his own head and immediately fired. She felt his body crumpling, tried to hold him to absorb the shock of the fall, "I sort of went down as he went to the floor   *   *   " and then felt some warm liquid on her hand. She then ran to the telephone to call a doctor. The length between the two shots was "seconds" a very short time. She had testified before the Coroner's jury and had signed her testimony but did not read it.

Shortly after the tragedy, the gentlemen she had been dining with and the night marshal came to her home. She then called the operator and insisted on her calling another doctor. She remembered Patrolman Murphy coming to the house, the two doctors and the Prosecuting Attorney, Sursa. On cross-examination, she stated that when she went into the house, "it was pretty dark", but there was a street light in front of the house, Mr. Cohen's house and it reflects some light. The light wasn't in the house but was coming in from the outside. She was sure it was a moon light night. She was asked, "Now after the first shot was fired, you had hold of the body of the deceased, I believe?" She answered, "No, not of the body." She didn't remember this question and answer at the Coroner's inquest "When the second shot was fired, did you have hold of his body?" Answer: "Yes, I was trying to get the gun." Neither did she remember this question at the Coroner's inquest, "Margaret, when you had hold of his body at the time of the second shot, was that to lower the gun?" Or her answer, "Yes, I was trying to throw his arm." She testified that she could see both hands of the deceased in the room, his left hand held her and he had the pistol in his right hand. She didn't know what position his hand was in when the first shot was fired but the gun was right at her head where his hand was. She hit the gun and that was the only time she ever touched it and immediately thereafter, the second shot was fired.

On cross examination she testified that when she felt Buford's gun against her temple, she attempted to throw it away or knock it off to shield herself.

A page of the World Almanac for 1949 was introduced in evidence and it showed that on the night of October 12, the moon rose at 8:29 in the evening and that there was a full moon on October 6, the moon reached its last quarter on October 14th.

Over the objection of defendant, portions of the testimony at the coroner's inquest were introduced for the purpose of impeachment. That testimony was:

"Q. You recognized him as Tots?

"A. Yes.

"Q. Now, is it at this point that he said, 'It is either him or me'?

"A. That is right.

"Q. When he did that? Put his arms around you?

"A. That is right.

"Q. And it was immediately after this point that you felt the gun on your face, or before?

"A. I said, 'Oh, Tots, don't be silly' and I felt a gun. I couldn't say where it was. I only know it was a gun.

"Q. How long has he known about this man? Did you ever quarrel about it?

"A. No, sir. He was very unhappy because I was leaving. He said I didn't have any business chasing around.

"Q. The door was open?

"A. No, sir, I don't think so. I must have closed it as I came in. I don't know. I couldn't answer that. I usually close the door when I come in but all I can remember is that his arms went around me.

"Q. Then was the second shot fired immediately after the first?

"A. I would say it was a matter of seconds.

"Q. When the second shot was fired did you have hold of his body then?

"A. Yes, sir. I was trying to get the gun.

"Q. Whether the door was open or closed do you know as to where you were in the room?

"A. Yes, sir. Where you came in there was a radio. Maybe a step from it. When he started to fall I tried to catch him. I didn't know he was hurt that bad.

"Q. Margaret, when you had hold of his body at the time of the second shot was that to lower the gun?

"A. Yes, I was trying to throw his arm."

The defendant then offered further testimony of the witness from the coroner's inquest, which was as follows:

"Q. Did you wrench the gun out of his hand?

"A. No, sir. I did not touch the gun. I am very much afraid of guns. I was trying to throw his arm. I can't believe I ever touched the gun. It happened so quick. It was just a matter of minutes."

At the close of all the evidence, defendant filed a motion for a directed verdict alleging that under all the evidence, plaintiff is not entitled to recover as a matter of law. This was overruled. The case was submitted to the jury which returned a verdict for plaintiff in the sum of $5,000.00.

Respondent relies upon the presumption against suicide. This contention requires an examination of that presumption. We here might observe that the presumption against suicide does not carry with it the further presumption that the death was accidental. Brunswick v. Standard Accident Ins. Co. 278 Mo. 154, 213 S. W. 45. Laessig v. Insurance Co. 169 Mo. 279, 69 S. W. 469. It arises from the facts that love of life is the strongest instinct of human beings, that there is a natural desire for self-preservation, that there is in the human breast a fear of death and the religious sanctions imposed upon one who commits suicide, and that of the pain one might suffer in the act of self-extermination. For these reasons, self-destruction is contrary to the general conduct of mankind. Most people desire to live, believe they will be punished in the world to come for taking their own life, naturally fear being ushered into the unknown and dread the pain that might result in the attempt. These natural considerations establish the general rule against acts of self-destruction. Because these

feelings are deeply and universally implanted in the human breast, we assume, (hence the presumption) that a person would not, in the face of all of them, destroy himself. But notwithstanding that, we know that many people, both sane and insane do, in fact, commit suicide. Therefore, it is when there is evidence of violent death and there is no evidence, or the evidence is all circumstantial, as to whether it was accidental or intentional that this presumption displays its full force. When the facts show a death by suicide and there are no facts to show that the death was accidental, within the meaning of the law, then the presumption has no weight or efficacy. Gilpin v. Aetna Life Ins. Co. 234 Mo. App. 566, 132 S. W. (2) 686. Sellars v. John Hancock Mutual L. Ins. Co. (Mo. App.) 149 S. W. (2) 404. Ray v. Mutual Life Ins. Co. of N. Y. (Mo. App.) 218 S. W. (2) 986. State ex rel. Bowdon v. Allen, 337 Mo. 260, En Banc, 85 S. W. (2) 63. Landau v. Pacific Mutual Life Ins. Co. 305 Mo. 542, En Banc, 267 S. W. 370. Richey. v. Woodman of the World 163 Mo. App. 235, 146 S. W. 461. Kornfeld v. Supreme Lodge O. M. P. 72 Mo. App. 604. A late and exhaustive note in 12 A. L. R. (2) 1323 states, with numerous citations, that this is "the general rule supported by the great weight of authority  *  *  ."

Can we say that plaintiff's evidence in this case shows accidental death?

It shows a man is found dead at 2 o'clock in the morning in the home of another, with a bullet hole in his head, powder burns around the wound where the bullet entered. Powder burns are on his left hand, he was lying on his back, a revolver lying within a few inches of his right hand; the gun had been fired twice, once through the open door and the other through his head and into the ceiling. Every fact is consistent with suicide. Would the facts that he was well known as a church member, a good business man in good financial circumstances, interested in the welfare and future of his city, in his business, apparently sane, etc., change the evidence found at the death scene? These facts only strengthen the presumption which already exists. They do not change the physical facts discovered at the scene. Certainly without the presumption there was not sufficient proof to say that his death was accidental. It had all the appearance of suicide. The presumption does not shift the burden of proof but places upon the defendant the burden of going forward with the evidence. Sellars v. John Hancock Mutual Life Ins. Co. Supra. Ray v. Mutual Life Ins. Co. of N. Y. Supra, Berne v. Prudential Ins. Co. of America, 235 Mo. App. 178, 129 S. W. (2) 92. This is conceded in respondent's brief.

Now looking at the evidence as a whole, we find a prosperous business man with a young lady working for him with whom he is undoubtedly infatuated. For nearly a year prior to his death, he had employed persons to watch her, spy upon her actions and report to him. They had watched her house until as late as 1 o'clock in the

morning to see when she returned, how she returned and with whom she returned. He had employed them on at least one occasion to follow her to a neighboring city, ascertain whom she met and report back to him. He had sued his wife for divorce and was so anxious to obtain a decree, that he was willing to give her $45,000.00, a new automobile, their residence and another piece of land, subject to receiving his freedom. He had talked of building a new home but evidently not for his then wife. On the day before the tragedy, he had employed a cab driver to watch the home of his lady employee until 1 o'clock in the morning, and report results immediately by telephone.

In the late afternoon before the tragedy and after his lady employee had quit work, gone to her home for her dinner, he called her by phone and asked her to come to the garage. He said it was important that he talk to her. She did go down to the place of her employer, and talked to him. He told her that he was getting his divorce on the morrow and wanted to make a date with her for the following evening after the divorce was granted. And then, so far as this evidence shows, for the first time he displayed to her his real feeling and suggested that they should get married. She called attention to his age and stated that she did not want to get married, at least at the present, as she wanted to resume her former occupation of reporting. He asked what she was going to do that evening and she told him she had a dinner engagement. She had refused to consider marriage, she was leaving his employment, she did not agree to go with him, she was going out with another man that very evening, which he resented.

Later that evening he employed a cab driver to take him ten miles north of Fredericktown to a tavern where his lady employee was spending the evening with her gentleman friend. He sat for three hours in a position so he could look into the tavern from the outside and observe her movements. During this time, he consumed 4 or 5 bottles of beer. When he saw her dancing with her friend, he made a remark that showed his resentment. He then had the cab driver take him back to the residence of his lady employee and he had gone up to the house and ascertained that the front door was unlocked. He sat in the cab a while longer and again went to the house. He then had the cab driver take him home. Three days before, he had another employee clean and oil his revolver and at 4 o'clock on the afternoon before the tragedy, this revolver was lying on the bed of deceased in his home. After the cab driver let him out at his home in the early morning of October 13, he drove in his car, taking his revolver with him, to the darkened home of Miss Burns. He parked his car a short distance from her residence. He went in the house and with his revolver in his hand, waited in the darkness for her to appear upon the scene.

When she went into the house, opened the door and had taken a step or two on the inside, the door still open, he seized her and said

to her what could reasonably be considered as a threat, "It has to be him or me." She told him to not be silly and he referred to her having a good time that evening and she answered that she was having a good time. She discovered that he was holding a revolver in his right hand and at her head. She tried to knock the revolver away with her left arm and it was discharged. The bullet went through the door in such a way that the door could not have been other than open. The moon and a street light 140 or 150 feet away furnished enough light for her to see. The moon was in mid heaven, having arisen as much as five and one-half hours before. She screamed and he immediately, holding the revolver in his right hand, placed it against his right temple and fired, taking his life.

We might pause here to say there is nothing in this evidence that shows he had ever been in her home before or at any time prior to the evening before the tragedy, had ever intimated to her a word of his infatuation. There is no evidence that she had ever looked upon him in any other manner, prior to the evening before the tragedy, except as her employer. Evidently others knew of this infatuation because one of his witnesses was aware of his interest in Miss Burns.

In the face of all these positive facts, the presumption against suicide utterly fails.

It is said in respondent's printed argument that defendant's evidence, and especially that of Miss Burns was so contradictory that it would raise a question in the mind of the jury as to its truthfulness. We have read and re-read the testimony and we can not agree with this statement. Whether she had hold of deceased's body or his arms when he killed himself, and while she was trying to keep him from shooting her with a pistol, as we view it, is wholly immaterial, even assuming that her testimony at the trial and at the inquest referred to the same time which apparently they do not.

Neither do we think there is any material conflict in the testimony of Miss Burns and the testimony of Sam Najim, Jr., as to the ability to see a revolver and what was happening in the room the morning of the tragedy. At that time the moon was shining, the door was open and Miss Burns was facing from the door with the light shining toward the deceased. On the night Mr. Najim made his test, there was no moon, he was facing the door and the evidence is not altogether clear and convincing that at the time he looked and was unable to see the revolver, that the door was open. On the other hand, all the physical evidence testified to by Najim, and others, corroborates the testimony of Miss Burns as to what actually transpired in the room when she returned home.

There is positive and corroborated evidence that he had been interested in her for a long time, that he was jealous of her, that he wanted to marry her, that she had refused him; that he objected to her "chas-

ing around'', that he lay in wait for her in her darkened home, uninvited and unwanted at 2 o'clock in the morning, armed with his loaded revolver and that, what little conversation he had with her at the scene and time of the tragedy, showed resentment on his part at her being out with another man and his determination that she should choose between them.

Could reasonable minds differ as to what his object was in so arming himself and placing himself in a position where he would meet her when she came home, seizing her and pointing the pistol at her head, but that he intended either to force or intimidate her with a deadly weapon into complying with his desires, or that he had an intention to kill her and himself or an intention to kill himself? As we view it, the uncontradicted evidence of his every act showed an intention to kill her and himself and only her quick action with her left arm prevented him from completely accomplishing his designs. From the facts and sequence of events, it would not be unreasonable to arrive at the conclusion that the discharge of the weapon near her head and her scream convinced him that he had shot her.

This insurance policy was a matter of contract entered into voluntarily between the deceased and the defendant. Its provisions were agreed to by each of them. It is a matter of common knowledge that the premium depends upon the amount of risk assumed by the insurer. By excluding suicide and other risks, the insured is benefited by a reduction in premium, the insurer assumes less risks. It specifically refused to assume the risk of death by suicide, while sane or insane, in this insurance contract. If the facts in this case do not show suicide upon the part of the insured, then we can conceive of no way that an insurer could prove self-destruction.

We believe that taking the evidence as a whole, that reasonable men could arrive at no other conclusion than that the defendant committed suicide.

But there is another reason why the appellant should prevail, even if the evidence did not show deliberate suicide, but showed that the death of deceased was caused by the discharge of the revolver without an intention on his part to take his life.

The law is that when the insured, himself, is the aggressor and voluntarily and culpably provokes and engages in an altercation with another person under such circumstances as to charge him with reasonable anticipation that his aggression will be met with such force or resistance as to put him in danger of death or bodily harm, then his death caused by the other person resisting his aggression is to be regarded as the natural and probable result of his deliberate exposure to danger by his own voluntary and intentional acts and conduct and does not come within the provisions of the policy which insures the deceased against death by ''accidental means.'' Moore v. Mutual Life Ins. Co. (Mo. App.) 237 S. W. (2) 210. Callahan v. Conn. General

Life Ins. Co. 357 Mo. 187, 207 S. W. (2) 279. Podesta v. Metropolitan Life Ins. Co. (Mo. App.) 150 S. W. (2) 596. Berne v. Prudential Life Ins. Co. of America 235 Mo. App. 178, 129 S. W. (2) 92. Camp v. John Hancock Mutual Life Ins. Co. of Boston, Mass. (Mo. App.) 165 S.W. (2) 277. Robinson v. Benefit Ass'n. of Railway Employees (Mo. App.) 183 S. W. (2) 407. Meister v. General Accident, Fire and Life Assurance Corp. 92 Ore. 96, 179 Pac. 913, 4 A. L. R. 718.

In this case the undisputed evidence all shows that the deceased went uninvited to the home of Miss Burns in the night time, armed with a loaded revolver, waited in the darkness for her return, seized her upon her entrance to the house, placed the revolver at her head, made remarks that showed resentment against her, her gentleman friend and her conduct, and the revolver was discharged as she knocked it away from her head with her left arm. It surely must have been within his reasonable anticipation and foresight to assume that she would resist as much as possible. If in the scuffle to protect herself, he was killed, though not with the intentional discharge of the revolver, his death was not caused by ''accidental means'' within the provisions of the policy and there can be no recovery.

We have read the cases cited by respondent and, when applied to the facts in this, they are not inconsistent with our conclusions. It is unnecessary to consider appellant's other objections as to the admission of evidence and to certain instructions.

The judgment of the trial court should be reversed and the cause remanded with directions to enter judgment for defendant. It is so ordered. *Blair, J.*, and *McDowell, J.*, concur.