**Anne E. IEPPERT, Plaintiff-Appellant,**

**v.**

**JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, a Corporation, Defendant-Respondent.**

No. 30795.

St. Louis Court of Appeals.

Missouri.

June 13, 1961.

Motion for Rehearing or Modification of Opinion or to Transfer to Supreme Court Denied July 11, 1961.

Raymond J. Lahey and Harold J. Cuddy, St. Louis, for appellant.

Kenneth Teasdale, Bruce E. Woodruff, Armstrong, Teasdale, Roos, Kramer & Vaughan, St. Louis, for respondent.

ANDERSON, Presiding Judge.

This is an action brought by Anne E. Ieppert to recover accidental death benefits under two policies of life insurance issued by defendant to plaintiff's deceased husband, John F. Ieppert. Plaintiff was the named beneficiary in each policy. After the issues were made up and depositions taken and filed in the cause defendant moved for a Summary Judgment. The court sustained said motion and from the judgment for defendant plaintiff has appealed.

There are two policies involved. The face amount of Policy No. M3823160 is $1,500, and the face amount of Policy No. M1818709 is for $1,000. The natural death benefit in each policy has been paid. Each policy contained a provision for the payment, subject to certain exceptions, of a sum equal to the face amount thereof, upon proof showing that the death of the insured was caused directly, independently and exclusively of all other causes, by a bodily injury sustained solely by external, violent and accidental means. The only exception, which is material in this case, provides:

"The company shall not be liable for the payment of the Additional Benefit as provided herein * * * (3) if such death results, directly or indirectly, or wholly or partially, (i) from any bodily or mental disease or infirmity, * * * or (iii) from suicide, while sane, * * *."

The insured was found dead at his home on January 1, 1959. His body was hanging by an electric wire which was around his neck and attached to a transom between the kitchen and the bedroom. There was a chair against the wall about six feet from

him. There were no eye witnesses to the event.

In plaintiff's petition it was alleged that the death of the insured was the result of bodily injury sustained through external, violent and accidental means, to-wit, accidental strangulation. It was then alleged that if the death of the insured was the result of any action of his own, then said act was the result of an irrational and irresistible impulse, hence unintentional, and accidental. In an amended answer, defendant pleaded the exception heretofore mentioned, then averred that the death of the insured resulted from the commission of suicide while sane and, as an alternative defense, that the death of John F. Ieppert resulted from mental disease or infirmity, and, therefore, under the terms of the policies no additional benefit for death by accidental means was due or payable to plaintiff.

In defendant's motion for Summary Judgment it was alleged, "that the pleadings, depositions and admissions on file with the Court show that there is no genuine issue as to any material fact and that defendant is entitled to judgment as a matter of law."

Plaintiff filed her reply to defendant's motion for Summary Judgment asserting the motion should be denied on the grounds, (1) that there existed genuine issues of fact, (2) that the depositions on file show that the death of the insured was a violent one, and thus a prima facie case of accidental death was made under Missouri law, (3) that the depositions on file raised issues of fact that could only be determined by a jury, and (4) that suicide as a result of an irresistible and irrational impulse is held to be an accident in Missouri.

The court's order and judgment was as follows:

"Defendant's Motion for Summary Judgment having been argued and submitted to the Court upon briefs, affidavits and depositions, and the court now being sufficiently advised doth find that there is no genuine issue as to any material fact and that the defendant is entitled to judgment as a matter of law for the reason that the insured met his death indirectly or in part from mental diseases or infirmities which according to the terms of the policy was an excluded risk.

"Wherefore, the Court doth order that summary judgment be entered in favor of the defendant and against the plaintiff, and that plaintiff's petition be dismissed with prejudice at plaintiff's cost."

Among the depositions on file in the case and considered by the court is one given by plaintiff, Anne E. Ieppert. She testified that in 1953 insured tried to take his own life by taking poison. At that time he was not living with plaintiff, but resided at his father's house. On that occasion plaintiff called the police because insured was running around the yard barefooted and without a shirt and was violent. The police came and took him to the City Hospital. After that episode insured moved back with plaintiff. Plaintiff thought that his wildness, at that time, was due to his drinking, but as the years went by she changed her mind about it. According to her testimony insured was a heavy drinker. She stated that he would be good for "just so long" and then would get on a drunk and there wasn't anything one could do with him. He would drink until he "got it out of his system." He was violent and imagined things. In 1953, when he attempted suicide, she thought he was sane. She further testified that she heard from insured's sister that insured had taken muriatic acid in 1939 because a girl he was going with turned him down. In July 1953, he took red squill, a rat poison. Insured was in an accident about 2 or 3 years before his death, and sustained a back injury and "nerve stuff", which hospitalized him for several weeks, after which he was home for about 3 months. After the

accident he drank more and did "wild crazy things." Plaintiff testified, "You couldn't talk to him. * * * There was no reasoning." Plaintiff testified, in 1957 or 1958, when she remonstrated with him about his drinking he loaded his gun and said "he would give me the same chance as he gave the rabbits—run." Plaintiff ran into the yard, and insured shot at her.

Plaintiff further testified that when insured was in the City Hospital for taking poison he was so violent he had to be chained. In 1957 he signed himself into Malcolm Bliss Hospital, and was there about a week. Plaintiff did not know why he was there, but thought it was on account of one of his drinking sprees. She went to the hospital to visit him, but he would not see her. After he came home she asked him why he went to Malcolm Bliss and he replied that he did not want to come home "because he'd hurt one of us and he didn't want to hurt one of us." She stated, "I asked them at the hospital if he was drunk, and they said no, it was a nerve condition that he was up there for. And I insisted, too, he might have been drunk but they claim he wasn't. * * the lady at the desk told me, it was for nerves."

Plaintiff further testified that insured was violent toward her many times; that he would have moody spells; that he chased her with a butcher knife four or five times; that sometimes he would cut buttons off her clothes, sometimes tear her clothes and sometimes throw them into the stove. She stated that, except for the time during which insured was at the Malcolm Bliss Hospital, he was never under the care of a psychiatrist, although she often suggested such treatment because he did such "crazy things." She thought he was mentally ill for a long time because of his actions.

Appellant testified she discovered her husband's body after his death. The house was all straightened up and his clothes washed. Plaintiff had moved from their home three days prior to insured's death, because she felt he was running around with another woman. She took up a separate residence on 12th Street. After she left, insured got in touch with her about some property rights. She next saw him on New Year's eve when he knocked on her door and said, "Here's the money I got left. * * * Don't come down home, because it won't be a pleasant sight." Plaintiff said she became excited and went to where he lived, arriving there about a quarter to eight and saw a noose hanging in the door. She tore down the noose and threw it in a yard down the street. She went there later with her daughter and her daughter's friend and waited until he came home, and when he arrived he told her to get out, that she could not stop him from killing himself. At the time he had a wild bleary look. He turned out the light and started to cry, and said, "When I started to cry I could kill you." He then left. Plaintiff waited forty-five minutes for him to return, and when he did not return concluded he was getting drunk for New Years. She said she thought he was trying to ruin her New Year's, so she went back home. She did not think he would "do it, because he never liked anything tight around his neck * * * if he would have shot himself or took poison, but not that. That is the last way I thought he'd go."

Plaintiff gave the following testimony.

"Q. Based on these facts that you have observed then, is it your opinion that his death was caused by his mental condition? A. Must have been.

"Q. Will you answer that yes or no? A. Yes.

"Q. It is your opinion that his death was caused by his mental condition? A. Yes.

"Q. In your opinion, how long had this mental condition existed previous to this time? A. I guess for years. * * * I guess all the time he took

poison, * * * I used to put it to the fact that he didn't have much schooling and didn't know how to live better and didn't have much of a home, but after we were married and things did get better, there just wasn't any reason for stuff he did. * * *

"Q. You don't think he * * * took his life because he was intoxicated? A. I don't know. Taken from the reports of the police and all of that, I don't think the man wanted to do that, but it was like he was possessed. He wasn't satisfied with anything.

"Q. You think he took his life because of the mental condition rather than the drinking? A. Yes, mental. * * * I think he was mentally unbalanced. * * * I don't say insane. He was mentally sick. And if he would have just went to a doctor, he might have helped himself, but you couldn't tell John that. * * * nobody in their right minds would do things like that.

Mr. Emde: "Q. * * * It is your opinion today, is it, that at the time of your husband's death, and for some period of time, probably two or more years before his death, he did suffer from a mental disorder, an emotional mental disturbance? The Witness: That's right.

Mr. Emde: "Q. There is no question in your mind, is there, that he committed suicide?

The Witness: "No.

Mr. Emde: "You don't have any reason to believe that he met with any foul play * * * ?

The Witness: "No. If I wouldn't have seen the wire there before, then I would have, too, because that would have been the last way I would have picked for John to go.

Mr. Emde: "There is no question in your mind that he actually committed suicide as opposed to the kind of thing where he might have accidentally, not in the legal sense, but in the common sense, hung himself?

The Witness: "No.

Mr. Emde: "You don't think he accidentally hung himself?

The Witness: "No, there was a chair sitting there.

* * * * * *

Mr. Emde: "Is there any doubt in your mind * * * that this mental condition, that this mental illness which you have described as having its onset around the time of the tractor-trailer accident, is there any doubt that this mental illness contributed to your husband's death? * * *

Mr. Lahey: * * * "Did the mental illness contribute to the death?,

The Witness: "Yes."

John E. Ieppert testified that he was the father of the insured; that the insured was born August 3, 1918; that insured attended school through the sixth grade, but was not too bright in school; that he was in the service during the second world war for about five months; that the reason he left the service was "medical tension"; medical discharge, he thought; that during the past five years he had seen his son once a week and sometimes twice a month; that as far as he knew his son was a normal boy mentally and did not do anything which seemed to him different from any other normal person; that he seemed normal when he came home from the service; that from the time of his discharge from the service, until six months before his death he seemed as normal as any other person; and that there was not anything mentally wrong with him at that time.

The witness further testified that he saw his son the last time about 3:45 P.M. on

December 31, 1958. At that time insured asked him if he knew why plaintiff had left. Witness suggested he talk things over with her, and insured replied, "I will, and if she don't go back with me, it will be else." He stated that insured did not seem upset, agitated or nervous at the time.

The next time witness saw insured was 3:15 P.M. on New Year's day. He stated "Anna Ieppert, my daughter-in-law, sent her little daughter over, Mary Ann, and asked me to come to the store, and I went out to the store, and she was out in the alley crying, Annie was * * * and she said 'go up and see John'. And I went up and the officer opened the door and there he was hanging, looking me right in the face." There was a chair by the wall six feet from the insured. The insured was fully clothed in his work clothes. He had on shoes. Insured was hanging in the door between the kitchen and the bedroom. The wire was around the transom and behind insured's ears.

The witness again testified that as far as he knew insured was a normal individual, with no past history of mental illness that he knew of. He didn't see any evidence of foul play; that he didn't look for any. He didn't know what was the cause of his son's death; that he couldn't say insured died by his own hand; that he did not know of any reason why anybody would want to take his son's life; that his son had no financial troubles and he didn't know nor did he have an opinion as to whether anybody killed his son.

He further testified that his son was sane as far as he knew; that he did not know of previous attempts by his son to commit suicide, but he had heard from the neighbors that there were such attempts; that he never saw his son wild and violent; that he had heard that it became necessary for insured's wife to call the police on numerous and frequent occasions, but that he was never there at such times; that he did not know his son had signed himself in at Malcolm Bliss Hospital; that he did not

notice any change in his behavior after the accident; that he did not notice his son being depressed; that he had no knowledge of his son being admitted to the City Hospital in June 1953 for taking strychnine poison; and that he had no knowledge of his son being admitted to the City Hospital in March 1939 for muriatic acid poisoning. The witness further testified:

"Q. In your opinion, you say he was sane. Do you take into consideration the attempts to take his life and all of the things that is brought out about this accident? Have you taken those into consideration? A. Well, taking things into consideration, why, you might say he was crazy * * *

"Q. But, is it your opinion he was crazy? A. No sir."

Otey S. Jones, M. D. testified he was a general practitioner in St. Louis, Missouri, and that he first treated insured in 1946 for an injury to his ribs; in 1949 for bronchitis; in 1950 for pneumonia and in 1951 for an allergy. He stated that insured on all these occasions appeared normal. The doctor further testified that in July 1953, he saw insured when he had taken some red squill which is used to kill rats. Insured's wife told the doctor that this was a suicide attempt, and insured who was present did not deny what she said. At that time, according to the doctor the insured was rational and was very quiet.

Dr. Jones further testified that on October 14, 1953, he treated the insured for an ingrown toenail and saw him again on February 19, 1954, at which time insured said he had pains in the chest, stomach and neck, and drank to kill the pain. The doctor's diagnosis at the time was that insured was just nervous. The doctor stated he knew at the time that insured was becoming an alcoholic. Insured was treated twice in May 1954 at his home for virus pneumonia which was due to exposure. At that time, according to Dr. Jones, the insured was becoming "more withdrawn in-

to himself. He didn't talk much." The doctor treated insured again on October 15, 1955. Insured, at that time, said he vomited blood and suffered pain in his groin. He was examined for hernia, but none was found. On this occasion the doctor gave him a nerve sedative with some alkalies to settle his stomach. The doctor stated that this was not the first time insured had vomited blood, but he did not know the cause of it. On this occasion, according to the witness, insured was "very withdrawn into himself. He had very little to say. * * * I would say, from what I know of him, that he was melancholic * * *. He brooded. He did not see the happy side of life." Dr. Jones further testified:

"Q. Is melancholy, in your profession, a form of mental illness? A. I would say it is.

"Q. What would a person suffering from melancholia be apt to do? A. Well, he would be apt to sit around and think about his circumstances, not be happy with them no matter what they were.

"Q. Would a person in that state be liable to commit suicide? A. He might. * * * he was withdrawn to some extent and he was very depressed and sad. * * * At this particular date that we are talking about is in 1955, at that time I think he would have a mild degree of melancholia. That was not at that time a mental condition. It was perhaps, just on the emotional level. * * * He was not normally healthy mentally at that time."

Mr. Emde: "I think I can clear this up. Then, he was not just a normal person emotionally upset? He was in some degree of mental illness?

The Witness: "That is correct, because it was constant. It was always there, at least whenever I saw him.

"Q. * * * at this time in 1955 he had some degree of mental illness? A. Some degree of mental illness, yes."

Dr. Jones treated insured in October 1956 for a bad cough, at which time, according to the doctor, insured's condition was essentially not any different from the times he had seen him previously. On February 19, 1957, insured was hospitalized in the Marian Hospital for nervousness and stomach trouble. X-rays, at that time, showed duodenitis, a forerunner of a duodenal ulcer. The doctor stated that the nervousness could have been caused by his mental condition, but not the stomach affliction. Insured was worse mentally on this occasion than he had been up to 1955. He was more nervous. He was still suffering from melancholia at the time, which was worse than it had been previously. On March 16, 1957, the doctor treated insured for a cold. Insured was nervous at that time and had some tremor. The doctor stated that this tremor was a manifestation of alcoholism, and that, in fact, alcoholism was the underlying basis of all his troubles, from 1954. He also stated that insured's mental condition was worse than it was on the previous visit; that there was a progression from 1955 to the time of this visit; that insured was definitely mentally ill; and that he gave insured tranquilizers at this time.

On May 10, 1957, Dr. Jones treated insured for the injuries he received in a truck accident. Insured was hospitalized for ten days. During that time insured was very quiet, but not too nervous. He was not agitated, but just lay quietly in bed. He did not drink during that period. During that ten days, according to the testimony of Dr. Jones, insured's mental condition improved. He received a tranquilizing drug, thoracin, a powerful drug, which can be received only through prescription. Insured did not get this drug in large doses, like a disturbed patient would, just small doses.

Dr. Jones treated insured next on June 14, 1957. At that time insured had headaches and trouble with his vision, and stated he was very dazed at the time of the accident. The doctor stated he presumed these headaches were from the accident; that he did not talk much and was still somewhat nervous, but in the opinion of the doctor not as bad as he was formerly. The doctor at that time gave him tranquilizers for his nervousness. Dr. Jones further testified that insured at the time was still suffering from melancholia, and was mentally ill, in a mild way. The next and last time Dr. Jones treated insured was August 19, 1957. He was suffering from influenza at the time. Dr. Jones stated he could not give an opinion as to insured's mental condition at that time. Insured was ill and did not have much to say. Dr. Jones further testified he believed insured had melancholia at the time of his death, which condition contributed to insured's death. He testified:

"Q. In other words, in your professional opinion, was his death in some respect caused by his mental illness?

"A. I would say yes. * * * If he was not mentally ill, he would not commit suicide. * * * I would say it (melancholia) was a mental disease in this case. * * * I think he would be mentally ill at the time of his death. * * * I just would think that the excessive drinking he did contributed to his death as well. * * * He either drank because of the melancholia, or he liked to drink and that produced the melancholia."

On cross-examination, Dr. Jones identified plaintiff's Exhibit A as a true copy of a statement he had made concerning the John Ieppert matter, and testified that in the last paragraph he had stated, "He is possessed by an irrational and irresistible impulse to hang himself, which he did on January 1st of this year." The doctor then testified that that was his present opinion.

Dr. Willard I. Nash testified, he was an osteopathic physician and had treated insured and his family since 1952. He treated insured for colds or sore throats, but not for anything serious. He stated that in 1952 insured seemed a very healthy and normal man, physically and mentally. This was true between 1952 and 1956. During that time insured always carried on a normal conversation and he never heard insured say anything unusual. The last time Dr. Nash saw insured was the last part of September 1958, when he treated him for nervousness and low blood pressure. The doctor stated that "as long as he was under my care he always seemed mentally all right, he never, his talk was fine, his speech was fine, and he never made no irrational statements or give me any indication that he wasn't mentally all right. * * * he didn't seem able to relax, and he seemed to be just a little under tension, and his blood pressure, of course, was low. * * he couldn't sit still, move his hands, and things like that." The doctor stated that, in his opinion, insured's nervousness was due to run-down condition, probably caused by faulty diet, and low blood pressure. The doctor treated insured four or five times during 1958. He stated insured always spoke normally and did not give any indication of any mental trouble; and that if insured had any mental condition he did not know it.

Appellant's first point is that the court erred in entering judgment in this case for the reason that the pleadings and evidence presented issues of fact triable by a jury. Specifically it is urged that a prima facie case for accidental death was shown upon proof of violent death, which prima facie case could not be destroyed by evidence which tended to show that insured committed suicide. Respondent contends to the contrary, and urges that this finding of the trial court that there was no genuine issue as to any material fact was proper under the pleadings, admissions and depositions on file in said cause.

In actions on policies of accident insurance where no more is shown than, that insured met a violent death, a presumption arises that the death was brought about through accidental means. McKeon v. National Casualty Co., 216 Mo.App. 507, 270 S.W. 707; Sellars v. John Hancock Mut. Life Ins. Co., Mo.App., 149 S.W.2d 404; Gilpin v. Aetna Life Ins. Co., 234 Mo.App. 566, 132 S.W.2d 686. But when contrary facts appear, the presumption disappears; and if the evidence is positive, clear and undisputed that insured's death did not result from bodily injury sustained through accidental means, there is then no issue for the jury, and this matter should be resolved by the court as one of law. Sellars v. John Hancock Mut. Life Ins. Co., supra. But where the defense pleaded is that insured took his own life, and the evidence is not sufficient to exclude every reasonable hypothesis of accident, or the cause of death remains in doubt, there is left, on account of the presumption against suicide, an inference of accident sufficient to make a jury issue of the cause of death. Brunswick v. Standard Acc. Ins. Co. of Detroit, Mich., 278 Mo. 154, 213 S.W. 45, 7 A.L.R. 1213; Gilpin v. Aetna Life Ins. Co., supra; Reynolds v. Maryland Casualty Co., 274 Mo. 83, 201 S.W. 1128.

We believe the evidence in this case excludes any theory that insured's death was the result of strangulation by mishap or miscalculation, but on the contrary shows conclusively that the insured intentionally took his own life. The events leading up to insured's death, as detailed by plaintiff, the fact that insured threatened suicide, and told plaintiff a few hours prior to his death that she could not stop him from killing himself, the condition of the room where he was found hanging, all point to the conclusion that insured took his own life. There was no evidence whatever tending to show accidental strangulation or foul play. In addition, plaintiff testified that there then was no question in her mind but that insured committed suicide and that she had no reason to believe the insured met with foul play, or that he accidentally hanged himself.

The only possible remaining issue of fact concerns insured's mental condition and its relation to insured's death. The depositions filed in the case are filled with a long history of strange behavior which indicate that insured had been suffering from mental disease over a long period of time, and was insane at the time of his death. Both plaintiff and Dr. Jones testified that "but for" the insured's mental illness he would not have taken his own life. Both testified they believed the insured was mentally ill at the time of his death, and that this mental condition caused his death. Defendant has abandoned its pleaded defense of suicide while sane, and contends that the depositions clearly establish that insured's death was caused by mental illness. Plaintiff's position is that if insured's death was not caused by mishap, but resulted from his own act, then said act was the result of an irrational and irresistible impulse and an accident within the meaning of the law. We are, therefore, excluding from consideration the possibility of a finding that insured was sane at the time he took his own life. Such a finding would require a judgment for defendant since suicide while sane is not an accident, and, since we have held there was no evidence of strangulation by mishap or miscalculation there remains for decision only a question of law, namely, whether a death caused by mental illness is a risk assumed under the terms of this policy. It is clear, therefore, that the trial court was correct in ruling there was no genuine issue as to any material fact, and that a request for summary judgment was proper under Rule 74.04, Mo.Rules of Civil Procedure, V.A.M. R.

Defendant, in seeking to uphold this trial court's judgment, relies principally upon our decision in Kaskowitz v. Aetna Life Ins. Co., Mo.App., 316 S.W.2d 132. The policy in that case excluded from coverage

death "resulting directly or indirectly, wholly or partly, from bodily or mental infirmity * * * even though the proximate or precipitating cause of death is accidental bodily injury." The insured died of injuries he received when he jumped from a window in the sixth floor of an office building. He was impelled to do this by reason of mental illness. We held that a recovery of the death benefit was precluded under the above quoted terms of the policy. In our opinion we reviewed the authorities which all hold that the suicide statute (Section 376.620 RSMo 1949, V.A. M.S.) may not be availed of to extend coverage to a class of accidents not covered by the policy, and held that since the policy sued on excluded accidental death resulting, directly or indirectly, from mental infirmity plaintiff could not recover. In reaching our decision we cited and followed, Scales v. National Life & Accident Ins. Co., Mo.App., 186 S.W. 948; Brunswick v. Standard Acc. Ins. Co. of Detroit, Mich., 278 Mo. 154, 213 S.W. 45, 7 A.L.R. 1213; and Fields v. Pyramid Life Ins. Co. of Topeka, Kan., 352 Mo. 141, 176 S.W.2d 281.

But plaintiff contends that the instant case is outside of the scope of the decision in the Kaskowitz case by reason of the difference in language employed in the policies involved; and to support such contention cites the decision of the Kansas City Court of Appeals in Spillman v. Kansas City Life Ins. Co., 238 Mo.App. 419, 180 S.W.2d 605, and the opinion of the Supreme Court in the same case on certiorari; State ex rel. Kansas City Life Ins. Co. v. Bland, 353 Mo. 726, 184 S.W.2d 425, 426. In that case the policy provided "that there shall be no liability hereunder for death resulting from self-destruction, while sane or insane * * * or directly or indirectly, wholly or in part, from poisoning, infection or any kind of illness, disease or infirmity." The insured there shot himself, and there was substantial evidence tending to prove he was insane at the time.

The Court affirmed a judgment for plaintiff, and in doing so held that in determining whether or not the cause of death was accidental, the law would go no further back in line of causation than to find the active, efficient and procuring cause, and, since the policy did not exclude death caused by accidental shooting, a finding that insured's death was accidental within the policy terms was proper. In other words, the ruling was, that the death of insured resulted from gun shot and not from the mental disease of insanity. The Supreme Court, on certiorari held that this ruling did not conflict with any of its previous decisions. The Supreme Court also held:

"In construing such or a similar clause this court has not had occasion to determine whether it was the plain and unambiguous intention of the policy to include self destruction while insane under the provision about death resulting from 'illness, disease or infirmity' after having expressly referred to it previously in providing 'there shall be no liability hereunder for death resulting from self-destruction, while sane or insane'. Respondents were fully authorized to chart their own course in holding suicide while insane was not excluded by the provision excluding death resulting from disease. We think the clause is ambiguous in this regard and is properly susceptible to respondents' construction."

At the time the Kaskowitz case was presented to us for decision, plaintiff therein cited and relied upon decision of Kansas City Court of Appeals in the Spillman case. In our opinion in the Kaskowitz case, we did not disagree with the Spillman case, but distinguished it in the following manner:

"The Spillman case is distinguishable from the instant case for the reason that the disease exclusion clause in the policy there sued on did not

contain the concluding words of clause (b) in the policy here involved, excepting coverage 'even though the proximate or precipitating cause of death is accidental bodily injury.'" [316 S.W.2d 138.]

Plaintiff in the case at bar points to the fact that the disease exclusion clause in the policy here sued on likewise does not contain the concluding words of clause (b) of the Kaskowitz policy as set out above, and for that reason the case at bar is ruled by the Spillman case. From this it is argued that since the policies sued on do not exclude the risk of accidental strangulation as a risk not covered, plaintiff should under the Spillman case be entitled to a judgment in her favor.

■■ We are unable to agree with the contention advanced by plaintiff. The policies provide that where mental disease directly or *indirectly,* or wholly or *partially,* causes death, accidental death benefits are not payable. These words, in our judgment, contain substantially the same meaning as the phrase "even though the proximate cause of death is accidental bodily injury" found in the Kaskowitz policy. But applying the rule that the court looks only to the active, efficient procuring cause in determining causation, as was done in the Spillman case, we are compelled, under the evidence in this record, to hold that such test points to insured's insanity as the active, efficient and procuring cause of insured's death. It is clear from the evidence that insured's mental infirmity was the condition which brought about the final result, namely, the death of the insured, and was the proximate cause thereof as that term is understood in the law. The trial court did not err in rendering judgment for defendant. Kaskowitz v. Aetna Life Ins. Co., supra.

The judgment is affirmed.

RUDDY and WOLFE, JJ., concur.