**Marilyn PIVA, Respondent,**

v.

**GENERAL AMERICAN LIFE INSURANCE COMPANY, Appellant.**

**No. WD 32927.**

Missouri Court of Appeals,
Western District.

Jan. 18, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 1, 1983.

(3) That he acquired the stolen property for a consideration which he knew was far below its reasonable value.

Ben R. Swank, Jr., Karen M. See, Kansas City, for appellant.

Robert E. Hart, Kansas City, for respondent.

Before SHANGLER, P.J., and PRITCHARD and DIXON, JJ.

SHANGLER, Presiding Judge.

The plaintiff Piva, wife of the insured decedent and beneficiary under a group insurance policy issued by the defendant General American Life Insurance Company, recovered a jury verdict for the accidental death of her husband. The award for accidental death [$16,000] was in addition to a like sum payable at death, a liability not in dispute. The plaintiff presented evidence that the decedent was an insured of the defendant, that the wife was beneficiary, that the policy provided a $16,000 death benefit and an additional like sum for accidental death, that the insured husband died from a gunshot wound to the head—and then rested her case. The policy denied the accidental death benefit where the loss was occasioned by "participation in, or in consequence of having participated in, the commission of an assault or felony." The defendant General American presented evidence which allowed the inference that decedent met death while a participant in an assault, if not a felony. The plaintiff did not surrejoin that evidence. General American contends that in that posture of the proof, the cause of action for accidental death indemnity was not submissible.

We reverse the judgment and remand for new trial.

In an action on an insurance policy for an accidental death indemnity, the risk of nonpersuasion to recover on the cause of action rests on the plaintiff. That

burden of proof, as in any other case, is governed by that fixed rule of law, and therefore does not shift. *Stogsdill v. General American Life Insurance Company,* 541 S.W.2d 696, 699 (Mo.App.1976); *Berne v. Prudential Insurance Company of America,* 235 Mo.App. 178, 129 S.W.2d 92, 98[3–7] (1939). The death of the insured from accidental means is an essential element to the cause of action, and the burden to prove that proposition abides with the plaintiff throughout the case. *Griffith v. Continental Casualty Co.,* 299 Mo. 426, 253 S.W. 1043, 1048[8, 9] (banc 1923). The proof of death by violent means raises a presumption of accidental death. *Di Paoli v. Prudential Insurance Company,* 384 S.W.2d 861, 864[1–4] (Mo.App.1964). That proof, unless refuted, acquits the risk of nonpersuasion and suffices prima facie for submission and judgment. *Ward v. Penn Mutual Life Insurance Company,* 352 S.W.2d 413, 419[1] (Mo.App.1961); *Sellars v. John Hancock Mutual Life Insurance Company,* 149 S.W.2d 404, 405[1] (Mo.App.1941); McCormick, Handbook on the Law of Evidence § 342 (2d ed. 1972).

The presumption of accidental death from the evidence of violent means rests on the fact of experience that a person loves life and does not willingly intend or invite death. *Perringer v. Metropolitan Life Insurance Co.,* 241 Mo.App. 521, 244 S.W.2d 607, 614[1–4] (Mo.App.1951); *Connizzo v. General American Life Insurance Company,* 520 S.W.2d 661, 664[3–5] (Mo.App.1975). Thus, by the very nature, the presumption of accidental death from the evidence of violent means is dispelled by the actual fact that death resulted from the assault or felony misconduct of the insured—and so excepted from policy coverage. *Connizzo v. General American Life Insurance Company,* supra, l.c. 665[6, 7]; *Ieppert v. John Hancock Mutual Life Insurance Company,* 347 S.W.2d 436, 444[1, 2] (Mo.App.1961). The presumption which sustains such a prima facie proof, therefore, is rebuttable and serves to shift to the adversary the burden to adduce evidence on the issue, but leaves with the plaintiff the risk of nonpersuasion to establish the gist of the case: that the insured died by accidental means. *Connizzo v. General American Life Insurance Company,* supra, l.c. 664[3–5]; *Di Paoli v. Prudential Insurance Company,* supra, l.c. 864[1–4]; *Lindemann v. General American Life Insurance Company,* 485 S.W.2d 477, 480 (Mo.App.1972).[1]

Thus, the presumption of accidental death from the violent means of the event accomplishes the role of evidence to acquit the initial burden of the plaintiff to prove that issue, but is not evidence. The presumption imputes the fact of accidental death, but does not constitute evidence of that fact. *Connizzo v. General American Life Insurance Company,* supra, l.c. 664[2–5]; *Di Paoli v. Prudential Insurance Company,* supra, l.c. 864[1–4]. It is the kind of presumption which, should nothing further be adduced settles the question—"so he who would not have it thus, must show cause." *Borrson v. Missouri-Kansas-Texas R. Co.,* 161 S.W.2d 227, 230[7] (Mo.1942). The presumption of accidental death from violent means, as we note, rests on the common experience of love of life and the concomitant probability that a person will not by misconduct deliberately put life at stake. A prima facie case based alone on the presumption of accidental death from a violent cause dissolves in the face of evidence so clear, coherent and certain as to compel *one inference only:* that the death was from the assault or felony misconduct of the insured—and thus not *accidental* within the sense of the policy. *Ward v. Penn Mutual Life Ins. Co.,* 352 S.W.2d 413, 420 (Mo.App. 1961); *Berne v. Prudential Ins. Co. of*

---

1. In the most exact sense, therefore, the *prima facie case* the presumption of accidental death from evidence of violent means yields that the imputation of accidental death from that event *both* suffices to submit the cause of action and, if the insurer undertakes to contest that imputation, shifts the burden of the evidence to that adversary. *See* among the many decisions, *Sellars,* supra, l.c. 405[1]; *Ward,* supra, l.c. 419[1]; *Di Paoli,* supra, l.c. 864[1–4]. The preeminent commentators approve that analysis. McCormick, Handbook on the Law of Evidence § 342 (2d ed. 1972); 9 Wigmore, Evidence § 2490 (Chadbourn rev. 1981).

*America,* 235 Mo.App. 178, 129 S.W.2d 92, 98[3–7] (1939); *Sellars v. John Hancock Mutual Life Insurance Company,* 149 S.W.2d 404, 406 (Mo.App.1941). In that event, unless the beneficiary countervails with substantial evidence of accidental death—other than the presumption, the insurer is entitled to judgment. *Di Paoli v. Prudential Insurance Company,* 384 S.W.2d 861, 864[1–4] (Mo.App.1964); *Ieppert v. John Hancock Mutual Ins. Co.,* 347 S.W.2d 436, 444[1, 2] (Mo.App.1961). In the determination whether the evidence by the insured that death was by accidental means amounts to substantial proof of that issue, the presumption does not weigh—since it is a device of procedure and functions only to fashion a prima facie case, and has no effect as evidence beyond that. *Connizzo v. General American Life Insurance Company,* supra, l.c. 664[3–5]. In that counterpoise of evidence, the presumption as such is not weighed, but the facts which invest the presumption, are. *Connizzo v. General American Life Insurance Co.,* supra, l.c. 665[10, 11]; *Sellars v. John Hancock Mutual Life Ins. Co.,* supra, l.c. 405[2, 3]; *Di Paoli v. Prudential Insurance Company,* supra, l.c. 865[1–4].

The insurer contends that the application of these principles to the evidence presented required the trial court to direct a judgment for the insurer, and in default of such action, then by this court on appeal.

The evidence was this: The police found Piva mortally wounded from bullet shots in the early morning, slumped against the wall of the apartment-residence next to the porch. His head was riven by a bullet, as was his shoulder. The wounds were from a .38 calibre weapon. A .22 calibre pistol was found next to Piva, perhaps even in touch with him. Two shells were expended and five live rounds remained in the chamber. In addition, five .22 calibre bullets were found in his garments. The wall where Piva was found slumped was beneath the window of the apartment occupied by one Graves. The window and periphery were perforated by bullet holes, and at least one other penetrated into the Graves apartment and was recovered. They were made

by a .22 or .25 calibre weapon. Detective Orr testified that other weapons were discharged during the incident, but only the .22 calibre pistol was recovered. A computer trace for the ownership was not successful. Tests of the pistol yielded no fingerprints. That weapon, according to the admission of plaintiff Piva, was of the kind the insured husband owned. Detective Orr gave opinion that the shots into the Graves apartment had been fired by the decedent Piva. Officer Thistlethwaite testified that based on the physical evidence he could not form an opinion as to whether or not Piva fired the gunshots.

The police were directed to the apartment-residence by the dispatcher who broadcast a report from Graves that a burglary and an attempt to break into that apartment or the one next door [occupied by the owner Morris] was in progress. The first to arrive at the scene was merchant-patrolman Zanatta, and shortly thereafter, regular police officers. On the way to the reported address, both Zanatta and officer Kovak saw a car speed away from the area. The officer gave chase but lost pursuit. The owner Morris informed the police that he was awakened at about 2:00 a.m. by the sound of blows on the door, followed by a scurry of footsteps across the front porch, then around the side of the building accompanied by a fusillade of gunshots. When the activity ceased, Morris arose from the floor and sought out Graves across the hall. Graves came out of his apartment into the common hallway, and limped. There was a red welt across the top of his left foot. Graves was not called as a witness.

■ General American contends that this evidence—that Piva met death in the participation of an assault or felony—destroyed the presumption of death from accidental means, and in the absence of proof by the beneficiary [other than the presumption itself] that death was by accident, the insurer was entitled to a direction of judgment. To dispel the prima facie case of a beneficiary which rests on the presumption alone [as does the Piva proof] so as to

justify a direction of judgment for the defendant, the rebuttal evidence of the insurer must be so clear, coherent and certain as to compel one inference only: that the death was from the assault or felony misconduct of the insured. That inference, in a word, must issue as a *matter of law, Ward v. Penn Mutual Life Insurance Company,* 352 S.W.2d 413, 421[5] (Mo.App.1961); *Ieppert v. John Hancock Mutual Life Insurance Company,* 347 S.W.2d 436, 444[1, 2] (Mo.App.1961); *Berne v. Prudential Ins. Co. of America,* 235 Mo.App. 178, 129 S.W.2d 92, 98[3–7] (1939). A proof less than certain—whether from internal or external contradiction, or from want of coherency, or other inducement to doubt—which prompts reasonable minds to differ that the conduct of the insured was an assault or a felony, leaves the ultimate decision of accidental death to the jury as an issue of fact. *Stogsdill v. General American Life Insurance Company,* 541 S.W.2d 696, 699[4–8] (Mo. App.1976); *McKeon v. National Casualty Co.,* 216 Mo.App. 507, 270 S.W. 707, 710[3] (1925); *Camp v. John Hancock Mutual Life Ins. Co.,* 165 S.W.2d 277, 283[12] (Mo.App. 1942). The principle is recapitulated in pith: *Sellars v. John Hancock Mutual Life Ins. Co.,* 149 S.W.2d 404 (Mo.App.1941) l.c. 406:

> When contrary facts appear, the presumption disappears; and if the defendant's evidence is positive, clear, and undisputed that the death of the insured did not result from bodily injury sustained through accidental means, then there is no issue of fact for the jury to determine, and the question should be resolved by the court as one of law by giving a peremptory instruction in favor of the defendant. *But on the other hand, if the defendant's evidence tending to show an absence of liability on its part is not positive, clear, and certain; if it, within itself, contains damaging and impeaching facts;* or if the plaintiff, in rebuttal, ad-

duces countervailing evidence supporting the conclusion that death resulted from a cause within the coverage of the policy, *then the ultimate question is one of fact to be determined by the jury as in the case of any other factual issue.* [emphasis added]

General American slights that authoritative principle and argues, rather, the terminology in *Connizzo v. General American Life Insurance Company,* 520 S.W.2d 661 (Mo.App.1975) that [l.c. 665[6, 7] ] "the presumption is purely procedural and is destroyed by substantial evidence controverting the presumed facts" for the effect that the insurer need adduce no more than *substantial* evidence to dispel the probative quantum of the presumption of accidental death as a matter of law and so, in the absence of other evidence on the issue by the beneficiary, to have peremptory judgment. Our decisions announce the uniform doctrine that the presumption of accidental death from evidence of violent means dissolves *only* in the face of evidence by the insurer *clear, coherent and certain* [or other variant of that certitude].[2] Any lesser coherency and cogency of the proof [or other evidence in rebuttal by the beneficiary], allows disparate inferences to reasonable persons, and so remits to the jury the question whether or not the death was by accidental means.

◼ *Connizzo* does not repudiate that doctrine, but confirms it with an analysis of the theory which informs the principle. *Connizzo* [l.c. 664[3–5]] explains the considerations of policy, experience or other given [in this case, the recognition that life is cherished] which engender a presumption of the kind operative in an insurance policy recovery for accidental death; that the presumption is procedural, and of the kind that shifts the burden of the evidence to the insurer. The opinion makes clear [l.c. 664]

**2.** Evidence by the insurer, "positive, clear and certain." *Sellars,* supra, l.c. 406. "Positive, clear and undisputed," *Ieppert,* supra, l.c. 444[1, 2]. "Positive, clear and certain evidence, in no material respect self-impeaching . . . convincingly showing, etc." *Ward,* supra,

l.c. 420. "Clear, positive and substantial." *Di Paoli,* supra, l.c. 865[5]. "With such certainty as to leave no room for reasonable controversy on the subject [by] . . . positive clear and undisputed evidence . . . ." *Berne,* supra, l.c. 95, 98.

that the presumption of accidental death from proof of violent means—as established by Missouri decisions—is not so fragile as to be overborne *as a matter of law* by "substantial evidence" by the insurer that death was from the assault or felony of the insured. *Connizzo* does not hold that the meager *substantial evidence* quantum entitles the insurer to judgment [in the absence of evidence other than the presumption by the beneficiary that death was by accident], and had no need to, because the evidence there—as the opinion says—as a matter of law allowed no inference the death was from an accident.

■ Our cases uniformly define *substantial evidence* [*Terminal Warehouses of St. Joseph, Inc. v. Reiners*, 371 S.W.2d 311 (Mo.1963), l.c. 317[7]] as:

> evidence which, if true, has probative force upon the issues, i.e., *evidence favoring facts which are such that reasonable men may differ as to whether it establishes them,* it is evidence from which the trier or triers of the fact reasonably could find the issues in harmony therewith; it is evidence of a character sufficiently substantial to warrant the trier of facts in finding from it the facts, to establish which the evidence was introduced. [emphasis added]

*Substantial evidence,* then, *is proof from which the arbiter of the fact may, but is not compelled, to find the issue* on which it was tendered. It is evidence of such a quality of nonpersuasion that a reasonable person may draw an inference other than the one the proof intended. *Smoot v. Marks,* 564 S.W.2d 231, 236[n. 7] (Mo.App. banc 1978). The usual procedural presumption [consonant with the rationale of *Connizzo* ] "disappears upon the abduction of substantial evidence" against the fact presume. *Terminal Warehouses,* supra, l.c. 316. That is not to say as General American argues, however, that the dissolution of the presumption of accidental death upon the pre-

sentation of *substantial evidence* that death came from the assault or felony of the decedent [where, as here, the case of the plaintiff rests on the presumption alone] compels a judgment for the insurer. In the face of *substantial evidence,* the presumption dissolves, so that "the jury receives the issue free of any presumption [but] the facts which gave rise to the presumption in the first place remain in the case and those facts, as well as the facts to the contrary, are for the jury." *Terminal Warehouses,* supra, l.c. 316–317]; *Michler v. Krey Packing Co.,* 363 Mo. 707, 253 S.W.2d 136, 139[1–4] (banc 1952). In that exercise, the jury may determine the issue for one party on the evidence of the other. *Wiener v. Mutual Life Insurance Company of New York,* 170 S.W.2d 174, 177[1–3] (Mo.App.1943).

■ The presumption of accidental death from a violent means operates to the same effect. It is only when the evidence of the insurer that death was from the assault or felony of the insured is of a quality—clear, coherent and certain as to compel the inference that death was from the misconduct of the insured—that peremptory judgment follows. *Sellars,* l.c. 406; *Ward,* l.c. 420; *Berne,* l.c. 98[3–7]; *Di Paoli,* l.c. 865[5]; *Ieppert,* l.c. 444[1, 2]—all supra. Where that evidence is of a lesser quality only *substantial,* [or where the beneficiary presents evidence of accidental death other than the presumption], the case goes to the jury divested of the presumption but accoutered with the facts which engendered the presumption, as well as the favorable effect of insurer evidence. *Griffith v. Continental Casualty Co.,* 299 Mo. 426, 253 S.W. 1043, 1048[11–13] (banc 1923); *Sellars,* supra, l.c. 406; *Stogsdill,* supra, l.c. 699[8]; *Ward,* supra, l.c. 421[6–9]. Thus, the terminology the insurer excerpts from *Connizzo:* "the presumption is purely procedural and is destroyed by substantial evidence controverting the presumed facts" means no more than that.[3]

3. Our concern with the *substantial evidence* expression in the context of an accidental death cause of action on an insurance policy transcends the argument the insurer General Amer-

ican asserts here. The *substantial evidence* terminology is an insinuation from *O'Brien v. Equitable Life Assurance Society of United States,* 212 F.2d 383 (8th Cir.1954). *O'Brien* is

The evidence by the insurer General American, taken most favorably to the verdict for the beneficiary, was not of such effect as to compel the inference that Piva died from an assault or felony misconduct. That is to say, the evidence—although substantial on the issue of nonaccidental death and so sufficient to rebut the presumption and fashion a jury issue—was not so probative as to exclude a reasonable hypothesis of death by accident as a matter of law. *Ieppert,* supra, l.c. 444[1, 2]; *Ward,* supra, l.c. 421[5]; *McKeon,* supra, l.c. 710[4–8]; *Camp,* supra, 282[11]. The episode described in evidence by the police witnesses, apartment owner Morris, and as derived from the telephone report of apartment dweller Graves—of frantic beats on the door in the early morning, a scurry of footsteps across the porch followed by a fusillade of gunshots, a car in rapid flight away from the scene, and the discovery of the body of insured Piva under the Graves' window mortally wounded by a .38 calibre weapon—does not compel the inference that Piva died from participation in an assault or felony. That evidence, with the other testimony, that the .22 calibre weapon found by Piva was not proved to belong to him [although Piva owned one of that type], that the bullets found inside the Graves' apartment were *either* from a .22 *or* .25 calibre weapon, the police testimony that other weapons [never found] were fired in the melee, all induce a reasonable inference that Piva died from an accidental cause and not from his own misconduct. That composite evidence [considered together with the disparate opinions of officer Orr—that Piva fired into the Graves' apartment—and of officer Thistlethwaite—that such a con-

a didactic analysis of the mechanics of a presumption in general and of the presumption of accidental death from evidence of violent means in particular. It instructs that the presumption suffices to prove the action prima facie, and to shift the burden of the evidence to the insurer, while the ultimate risk of nonpersuasion remains on the plaintiff proponent. These basic tenets of our law [iterated in our opinion] rest on the repeated rationales of the Missouri decisions. *Connizzo* and other Missouri cases [e.g.] *Boring v. Kansas City Life Insurance Company,* 274 S.W.2d 233, 240 (Mo. 1955) quite properly cite that exposition.

*O'Brien,* however, also asserts as Missouri law that *substantial evidence* by the insurer that death was not by accident, but by misconduct of the insured—absent evidence by the plaintiff [in addition to the presumption itself] that death was by accident, entitles the insurer to a peremptory judgment. That our decisions simply do not adopt that rationale, but rather require the insurer to prove evidence which compels the inference of nonaccidental death as a matter of law has been the preoccupation of this opinion. The excerpt we cite from *Sellars* expresses, *par excellence,* the settled—and informed—principles which govern the cause of action. The other cases which have dealt with the question, before and after *Sellars,* uniformly apply that rationale. [e.g., *Ward, Perringer, Ieppert, Di Paoli, McKeon, Berne, Griffith,* all supra, among others.]

The exposition of *O'Brien,* other than the mechanics of the presumption [already thoroughly documented in our decisions] does not respect the Missouri decisions it cites. *Sellars,* as the excerpt we cite [l.c. 406] shows, holds—contrary to *O'Brien*—that substantial evidence does not suffice to direct a verdict on the issue of accidental death. Only evidence "positive, clear and undisputed" that "leaves no issue of fact for the jury" accomplishes that. *Perringer,* also cited in *O'Brien,* holds that the insurer is entitled to a direction of judgment [l.c. 614] only when "there are *no* facts to show that death was accidental" [emphasis added], not on mere substantial evidence. *Griffith* [Mo. banc] also cited, makes clear [l.c. 1048[10–13] that where the evidence [either by the insurer or plaintiff] on the issue of accidental death is doubtful, the facts which give rise to the presumption coupled with the option of the factfinder to determine the doubt in favor of the plaintiff suffice to take the case to the jury.

The insurer defendant, General American, cites not only *Connizzo* but also *O'Brien* for the assertion that substantial evidence by the insurer [where the plaintiff rests on the presumption alone] not only dispels the presumption, but entitles the insurer to judgment. *Connizzo,* as we noted, posits decision on the established principle in such cases [l.c. 665[8, 9]]: "[t]he case is not to be withdrawn from the jury unless reasonable minds could not differ on the proper disposition of the case," then concludes [l.c. 665[10, 11]: "[n]o reasonable inferences can be drawn from any or all of these facts to lead to a conclusion that the insured died as a result of an accident"—and so avoids the error in *O'Brien.* It is understandable that the insurer General American was misdirected by the *O'Brien* references in *Connizzo.* As our discussion shows, *Connizzo* rests firmly on the developed rationale of Missouri precedents. Our opinion confidently adopts *Connizzo* as a precedent for decision.

clusion could not be drawn] allows the reasonable hypothesis that it was Piva who pounded on the door to escape pursuers, then as they approached [in the car], was shot down under the Graves' window as he attempted to flee. The .22 calibre pistol found by his side, a reasonable factfinder could believe, was left to incriminate the dead person and so distract investigation. The jury was free to draw the inference that death was from the assault or felony misconduct of the insured, but chose to determine that it was not. That verdict rests on substantial evidence, and we are bound by that determination of fact. *Stogsdill*, supra, l.c. 699[4–7]; *Sellars*, supra, l.c. 406; *Ieppert*, supra, l.c. 444[1, 2].

The insurer General American contends next that the instruction definition of accident confused the jury, and so was prejudicial. Instruction No. 9 submitted:

"Accident" as used in these instructions means an event that takes place without foresight or expectation; an undersigned [sic] sudden and unexpected event; a mishap resulting in injury to the person.

The insurer argues that *accident,* quintessentially, means *an unforeseeable and unexpected event*—a definition rendered by the first clause of Instruction No. 9—that the second clause of the instruction: *an undesigned sudden and unexpected event* was a virtual redundancy of the first clause, and that the third clause of the instruction: *a mishap resulting in injury to the person* extended the essential sense of *accident* beyond the adventitious, and so compounded redundancy with ambiguity.[4] The argument amounts to a criticism that Instruction No. 9 rendered not one definition, but three.

MAI does not define *accident* for such a cause of action. Instruction No. 9 is

a rescript of the definition found in *Lindemann v. General American Life Insurance Co.,* 485 S.W.2d 477 (Mo.App.1972), a suit to recover for an accidental death under a policy of insurance. The definition in *Lindemann* [l.c. 479, n. 1] derives from *Murphy v. Western & Southern Life Insurance Co.,* 262 S.W.2d 340, 342 (Mo.App.1953), which simply recites from a dictionary. In both *Lindemann* and *Murphy* the definition was consulted for the nature of the proof required to establish an *accident* in such a cause of action, and not to formulate a proposition for jury instruction. An instruction, unlike a usual definition, must not only delineate the substantive law, but must also be readily understood. That test appertains as well to a non-MAI instruction. *Bayne v. Jenkins,* 593 S.W.2d 519, 530[9, 10] (Mo. banc 1980). The structure of an improvised instruction, no less than an MAI model, must be "simple, brief, impartial, free from argument, and shall not submit to the jury or require findings of detailed evidentiary facts." Rule 70.02(e); MAI (Third ed. 1981), General Approach, p. XXXV.

We agree that the essential cause of action to recover for an accidental death within an insurance policy coverage requires proof that the insured died from an event not foreseeable and not expected. We agree also that the term *without foresight or expectation* [tendered by the insurer][5] is an irreducible synonym for *accidental* within such a context. *Stogsdill v. General American Life Ins. Co.,* 541 S.W.2d 696, 699[4–7] (Mo.App.1976). The instruction tendered by the defendant as well as the first clause of the instruction actually submitted: *an event that takes place without foresight or expectation*—both rendered such a definition. The submitted Instruction No. 9, however, contained two addition-

4. The insurer contends, also that the misspelled word *undersigned* [for undesigned], although corrected by the slashed *r,* was another source of confusion to the jury as to what the instruction directed. The typographical adjustment made clear the word intended and could not have contributed to any error otherwise shown. *Bollman v. Kark Rendering Plant,* 418 S.W.2d 39, 49[23–24] (Mo.1967); also, *Wegener v. St. Louis County Transit Co.,* 357 S.W.2d 943, 948[3, 4] (Mo. banc 1962).

5. The defendant insurer tendered Instruction No. A for the definition: "The term 'accident' as used in these instructions means an event that takes place without foresight or expectation." That tender was refused by the court.

al definitional clauses. The second clause—*an undesigned sudden and unexpected event* is a virtual replication of the essential definition, and is only a redundancy without undue favor to either party. The third clause—*a mishap* resulting in injury *to the person*, the insurer contends, simply does not define *accident* in terms of the substantive cause of action, and misdirects the jury.

The insurer argues that Instruction No. 9 submits three separate definitions of *accident,* a multiplicity condemned by MAI. *Black v. Kansas City Southern Railway Co.,* 436 S.W.2d 19, 27[13–15] (Mo. banc 1968). We agree that Instruction No. 9 was unduly prolix and redundant. We agree also that the instruction was multifarious in that it combines diverse and independent meanings. The first and second clauses of the definition submitted by Instruction No. 9 are of virtual equivalence, and so only redundant. The third clause defines *accident* in terms of *mishap* and so introduces a meaning extraneous to the substantive cause of action. That term, by separate definition,[6] means *bad luck* or *misfortune.* The jury, of course, did not have the separate definition of *mishap,* but the *bad luck* and *misfortune* meanings are the primary equivalents, and presumably, the common usages for that word. Instruction No. 9 was fit as a usual dictionary definition of *accident*—primary, secondary and tertiary usages *seriatim.* A lexicon definition does not, *ipso facto,* suit as an improvised instruction under MAI, unless also constructed as a valid statement of the substantive law [*Bayne v. Jenkins,* supra, l.c. 530[9, 10]] and otherwise in terms "simple, brief, impartial, free from argument." Rule 70.02(e).

The question of prejudice remains. An instruction not in the MAI, and therefore improvised, must conform to the theory of MAI: that the statement follow the substantive law and can be readily understood. *Kirkwood Medical Supply Co. v. Ann Patterson Enterprises, Inc.,* 511 S.W.2d 433, 435[3–5] (Mo.App.1974); *Holt v. Myers,* 494 S.W.2d 430, 440[10–12] (Mo.App.1973). We have determined that Instruction No. 9 does not conform to the theory or practice of MAI. That instruction submits only a definition, but at the same time, the only substantive contention in issue.[7] The definition of Instruction No. 9, therefore, submits the entire cause of action and, if aberrant as a definition also misdirects the arbiter of the verdict. That the multifariousness of definition Instruction No. 9 submits was not benign was evident from the inquiry from the jury to the court during deliberations: "Instruction # 9—Is this the only definition of accident that we can apply to this case?" It is a reasonable assumption that the want of a guide on that quintessential issue of the case by an instruction direct and plain prompted the jury uncertainty. It is sufficient cause for reversal in any case, but the close balance of the evidence here makes that disposition all the more cogent. *Braun v. Lorenz,* 585 S.W.2d 102, 109[8–10] (Mo.App.1979).

The police were alerted to the apartment-residence where Piva was found by a telephone report from Graves of an attempt to break into his quarters. That conversation with the dispatcher was taped as a regular procedure. The tape was rerecorded onto a cassette after six months, and the original

---

**6.** Webster's Third New International Dictionary, Unabridged (1961).

**7.** The plaintiff submitted the cause of action by Instruction No. 5:
 Your verdict must be for the Plaintiff if you believe:
 First, defendant issued its policy of insurance to American Commercial Lines Incorporated and under which Edward Piva was insured, and
 Second, the policy was in force on September 12, 1978, when Edward Piva died, and

Third, plaintiff then was the beneficiary of the policy, and
Fourth, the death of Edward Piva was the result of an accident.
There was no contention that the policy issued to the deceased as an insured, nor that it was in force when he died, nor that the plaintiff was beneficiary. The litigation was brought, and was submitted, to decide whether the death was by *accident* within the policy coverage.

record was erased so that the tape could be used again. Graves did not testify. The cassette was tendered as an exhibit, but the court refused the evidence. Major Dailey of the police department testified as to these procedures as custodian of the records. The testimony was also that Dailey was neither custodian nor supervisor of that transaction at the time of the transfer from tape to cassette. The court refused the exhibit because Major Dailey was not the person "supervising or taking the transcription." [8]

 The exclusion of the exhibit on any of those grounds was error. To enable a record as evidence under the statute [§ 490.680], the *custodian or other qualified witness* must testify as to the mode of preparation of the record, that it was made in the regular course of business at a time close to the transaction recorded, and that the sources of information were such as to justify admission. These conditions met, the statute invests the record with a presumptive verity, and so excepts them from the hearsay rule. *State v. Graham,* 641 S.W.2d 102 (Mo. banc 1982). That the witness was not custodian of the record at the time it was made does not disqualify the exhibit. A knowledge of the procedure by which the records are kept suffices to establish the mode of preparation. *Fisher v. Gunn,* 270 S.W.2d 869, 878[10] (Mo.1954). That the witness was not custodian of the record at the time of preparation, nor participated in the event the record describes, nor had personal knowledge of the entry, does not affect the competency to testify as to the mode of preparation. *Rossomanno v. Laclede Cab Company,* 328 S.W.2d 677, 683[13] (Mo. banc 1959). There is no contention that the record was not kept in the regular course of business or that the sources of the information the cassette reflects would not justify a court, within the discretion allowed, to admit the exhibit. To refuse the cassette as evidence because Major Dailey did not personally supervise the

transfer of content from the original tape was error.

A transcription of the cassette-recorded conversation was also tendered as an exhibit separately, and separately denied on the ground that it was not the best evidence. The insurer General American contends that the exclusion of that typewritten transcript also was error. The cassette and transcript of that content were *both* available to the jury, *both* offered, and *both* rejected. It is evident that the transcript was merely intended to facilitate the oral narrative of the contents of the cassette in the trial proceedings. The parties *both* agree that the transcription faithfully reproduces the cassette content, and *both* rescript the transcription in the briefs on appeal. The plaintiff took the position that the cassette was not admissible under the statute [§ 490.680], and with that objection sustained, prevented the transcription from evidence on the ground that the cassette, and not the reproduction, was the best evidence. We rule that the cassette was erroneously excluded, and adopt the written transcription of that content presented by the parties to determine whether the exclusion of the cassette-transcription was error.

 The insurer contends that the cassette [and transcription of that content] represents evidence material and vital to the defense in that the content shows "the circumstances surrounding the presence of Edward Thomas Piva on the premises at 1404 Ruby at 2:00 a.m. in the morning of September 12, 1978, and that Piva was participating in the commission of an assault or felony." The plaintiff contends that the content of the cassette came in by other means, so that whatever error resulted from the exclusion of those exhibits was not prejudicial. There was police officer testimony at the trial of the report by Graves to the dispatcher [recorded on the tape and then transferred to the cassette] of an attempt to break into his premises or into the apartment across the hallway, who in turn,

---

8. In context, what the court and counsel undoubtedly meant was that Dailey did not supervise or actually transfer the conversation from

the tape onto the cassette. A *transcription,* of course, is the source reproduced in written form.

repeated that colloquy to the officers and directed them to the specified address. The cassette, however, records more:

Dispatcher: And it's at 1404 Ruby and they're breaking in there at this time?

Graves: Yeah.

Dispatcher: Alright, are you upstairs or downstairs?

Graves: Downstairs.

Dispatcher: Okay.

Graves: They're just getting out of the car right now.

Dispatcher: They're getting out of the car?

Graves: Yeah.

Dispatcher: And coming to break in?

Graves: Yeah, they've already been over here once.

Dispatcher: Alright, did they gain entry then?

Graves: (No response)

Dispatcher: Did they get in when they were there before?

Graves: You better hurry because here they come.

Dispatcher: Okay Sir, we'll send a car on down there.

The plaintiff contends that the evidence suggests Piva was randomly present at the time of the assault, that Piva attempted to flee from the intruders, but was shot down as he sought refuge. That was a legitimate inference for the jury from the evidence presented. A legitimate inference from the evidence *not* presented [that the interlopers had been there once already], however, was that the presence of Piva was not random or innocent, but that he was among the participants of the assault on Graves and had been there before with them—and that he died, not by accident, but in that illicit enterprise. The jury was entitled to the excluded evidence and the opportunity to draw that inference or any of the other diverse inferences the evidence logically yields. In a case so closely balanced, the jury should not be relegated to only cumulative proof.

The judgment is reversed and the cause remanded for a new trial.

All concur.